IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 03–cv–01526–EWN–BNB


MICHAEL SEDILLOS,
BEA SHEPARD,
ROXANNE RHODES,
JENNIFER WERNER,
CECELIA WALTERS,
and DENVER CLASSROOM TEACHERS ASSOCIATION,

      Plaintiffs,

v.

THE BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 1
  IN THE CITY AND COUNTY OF DENVER,
JERRY WARTGOW,
OFFIE HOBBS, and
JANE AND JOHN DOES 1–7,
in their individual capacities,

      Defendants.

---

## ORDER AND MEMORANDUM OF DECISION

---

Plaintiffs' federal claims in this case arise under 42 U.S.C. § 1983. Plaintiffs Michael

Sedillos, Bea Shepard, Roxanne Rhodes, Jennifer Werner, Cecelia Walters, and Denver Classroom

Teachers Association (collectively "Plaintiffs") allege that Defendants Board of Education of

School District # 1 In the City and County of Denver (hereinafter "the Board of Education"),

Jerry Wartgow, Offie Hobbs, and Jane and John Does 1–7, in their individual capacities

(collectively "Defendants") (1) violated section 1983 by retaliating against them for exercising

their First Amendment rights to free speech and association, and (2) breached the Plaintiffs'

employment contract.  This matter is before the court on (1) "Defendants' Motion for Summary

Judgment," filed April 8, 2004; (2) Defendants' "Objection to Magistrate's Order Denying

Motion to Permit Limited Waiver of Attorney-Client Privilege," filed April 27, 2004; (3)

"Plaintiffs' Motion to Reopen Discovery for a Limited Purpose," filed April 21, 2005; and (4)

"Plaintiffs' Motion for Leave to File Second Amended and Supplemental Complaint," filed April

21, 2005.  Jurisdiction is based on 28 U.S.C. § 1331 (2004).

## FACTS

### 1.   *Factual Background*

North High School ("NHS") is a large inner city high school.  (Defs.' Mot. for Summ. J.;

Br. in Supp. of Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 1 [filed Apr. 8,

2004] [hereinafter "Defs.' Br."]; *admitted at* Pls.' Corrected Resp. to Defs.' Mot. for Summ. J.,

Resp. to Defs.' Statement of Alleged Undisputed Facts ¶ 1 [filed June 21, 2004] [hereinafter

"Pls.' Resp."].)  Low attendance and high drop-out rates are common problems at NHS.  (*Id.*)  In

July 2001, the Denver Public School system ("the District") hired Defendant Dr. Jerry Wartgow

as Superintendent.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 2; *admitted at* Pls.'

Resp., Resp. to Statement of Undisputed Facts ¶ 2.)  At approximately this same time, the

District received notice that NHS ranked 296th out of 301 high schools in Colorado.  (*Id.*)

The District had three primary goals with respect to NHS: (1) motivating high

expectations for all individuals involved in the educational process, (2) improving the

performance of the students, and (3) closing the gap between students' performance levels.  (*Id.*,

Statement of Undisputed Material Facts ¶ 3; *admitted at* Pls.' Resp., Resp. to Statement of

Undisputed Facts ¶ 3.)  Schools that fell in the "unsatisfactory" category had three years to make

significant improvements or the State of Colorado would take over the school or convert the

school to a charter school.  (*Id.*, Statement of Undisputed Material Facts ¶ 5; *admitted at* Pls.'

Resp., Resp. to Statement of Undisputed Facts ¶ 5.)  In the Fall of 2002, NHS moved up to

"low" in the rankings and then moved up again in the Fall of 2003, though it still remained low.

(*Id.*, Statement of Undisputed Material Facts ¶ 7; *admitted at* Pls.' Resp., Resp. to Statement of

Undisputed Facts ¶ 7.)

The principal selection committee of the Collaborative Decision Making Committee (the

"CDM"), included teacher representatives, parent representatives, community representatives,

and one student.  (*Id.*, Statement of Undisputed Material Facts ¶ 8; *admitted in relevant part at*

Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 8.)  Defendant Dr. Offie Hobbs was one

of the three candidates recommended by the NHS principal selection committee.  (*Id.*)  In June

2002, the District hired Defendant Hobbs as Principal of NHS.  (*Id.*)  Defendant Hobbs, who is

African-American, was previously an elementary principal of a charter school in Chicago, Illinois. (*Id.*, Statement of Undisputed Material Facts ¶ 9; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 9.) The District hired Greg Williams, an African-American, to work at NHS shortly after Defendant Hobbs' arrival. (*Id.*, Statement of Undisputed Material Facts ¶ 11; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 11.) The teachers at NHS believed that Defendant Hobbs and Williams were close friends and they had a "kind of pact" because they were both African-American and from Texas. (*Id.*)

In November 2002, Defendant Hobbs sent an electronic mail message to Defendant Wartgow, Joseph Sandoval, and Dave Debus entitled "Report-Response" which listed some of the "interventions" that NHS was doing "to address student achievement as an unsatisfactory school." (Defs.' Br., Ex. B, 65 [11/22/02 Email Re: "Interventions"].) Defendant Hobbs listed proposed changes in the curriculum, particularly the math and English departments. (*Id.*) Defendant Hobbs suggested (1) monitoring and increasing attendance, (2) allocating personnel for tutoring, (3) addressing assessment issues including CSAP, and (4) working on expanding new programs. (*Id.*) Debus testified that many of the items listed did not come to fruition. (Pls.' Resp., Ex. 125 at 217–22 [Dep. of Debus].) Defendants identified one teacher, Charles Ballenger, who thought Defendant Hobbs instituted "many good changes and [tried] to set high standards for the future of [the] school." (Defs.' Br., Statement of Undisputed Material Facts ¶ 15; Ex. B,

177 [4/23/03 Email From Ballenger to Pl. Rhodes].)  Defendants Hobbs' arrival at NHS and

subsequent policies caused an internal revolution amongst the teachers and staff.

In December 2002, NHS placed Williams on administrative leave after several female

students made allegations of sexual harassment.  (*Id.*, Statement of Undisputed Material Facts ¶

13; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 13.)  The

District and the Denver Police Department conducted an investigation in which Williams was

"exceptionally cleared" of any wrongdoing.  (*Id.*)

On April 15, 2003, Plaintiff Roxanne Rhodes sent an electronic message to a group of

teachers, inviting them to her home to "strategize," and "plan some effective methods of getting

the word out about what's going on [at NHS]."  (Defs.' Br., Ex. B, 18 [4/15/03 Email from Pl.

Rhodes].)  The teachers discussed strategies such as (1) walk outs and strikes, (2) boycotting

faculty meetings, (3) and changing the administration.  (*Id.*, Ex. B, 18 [4/15/03 Email from Pl.

Rhodes], 34 [Memorandum "Strategies: Actions We Can Take"].)  The memorandum entitled

"Strategies: Actions We Can Take" was prepared by Christina Headrick.  (Pls.' Resp., Ex. 76 ¶ 2

[Aff. of Christina Headrick].)  Headrick was present at the meetings where this memorandum

was generated and does not "recall that any of the Plaintiffs had more than peripheral

involvement in any of those meetings, if they came to any at all."  (*Id.*)  Headrick stated that

"[t]he ideas listed on [Defendants] exhibit 34 were simply a brain-stormed list of things that

could be tried to bring our many concerns to the attention of the [D]istrict."  (*Id.*)

In May, all four teachers on the CDM agreed to resign upon the recommendation of Reverend Aaron Gray. (*Id.*, Statement of Undisputed Material Facts ¶ 20; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 20.) Rebecca Zachmeier testified that "[t]here was a lot of tension in the building over what . . . [Defendant] Hobbs was trying to do." (Defs.' Br., Ex. A, Dep. of Rebecca Zachmeier at 37 [Dep. of Zachmeier].) Defendant Hobbs testified that "with [Rhodes] and I, it was a constant fight on everything. Whatever it was, [Rhodes] and I were at a difference of opinion." (Pls.' Resp., Ex. 40 at 134 [Dep. of Def. Hobbs].) Defendant Hobbs could not recall any specific changes he tried to bring forth that Rhodes tried to stop.

> Q.   You told me that you recommended [Plaintiff Rhodes's] administrative transfer because she was an obstacle to change. Would you explain what you meant?
> A.   Any changes I tried to bring forth, [Plaintiff Rhodes] tried to stop them.
>
> Q.   Be specific.
> A.   I can't be any more specific than that.
>
> Q.   Tell me what changes you were trying to bring forth that she stopped.
> A.   Right now I can't think of a specific example.
>
> Q.   Not a single one?
> A.   Not a single one.

(*Id.*, Ex. 40 at 127–28 [Dep. of Def. Hobbs].)

Due to the school-wide conflicts, Michael Simmons, of the Community Development Office, set a meeting for April 7, 2003. (Defs.' Br., Statement of Undisputed Material Facts ¶ 27; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 27.) The

parties refer to this meeting as the "sticky note" meeting. (*Id.*) The purpose of the meeting was to bring "interested parties together in a room in an effort to air out and hear what the problems were at [NHS]." (*Id.*) On May 19, 2003, there was a second meeting at NHS in Defendant Wartgow's presence. (*Id.*, Statement of Undisputed Material Facts ¶ 28; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 28.) The purpose of the meeting was to discuss the process and timetable used in the evaluation of principals including Defendant Hobbs. (Pls.' Resp., Ex. 86 [5/12/03 Letter to Faculty and Staff Re: Principal Evaluation Meeting].) Defendant Wartgow testified that he told the staff he "was there . . . to see whether or not it was possible for the people in the room to come together and work together to create a positive environment at [NHS] that would be conducive to meeting the goals of the [D]istrict." (Defs.' Br., Ex. A, Jerome Wartgow Dep. at 144 [Dep. of Def. Wartgow].) Ceratin meeting participants stated that Defendant Wartgow was "very angry and very paternalistic" at the meeting. (Pls.' Resp., Ex. 14 ¶ 10 [Aff. of Louise West], Ex. 30 ¶ 14 [Aff. of Pl. Rhodes].)

In June, Defendant Wartgow decided to transfer Defendant Hobbs and the NHS administrative team because he felt the situation at NHS had deteriorated to the point that in order to improve the educational environment, changes in personnel within the building were necessary. (Defs.' Br., Statement of Undisputed Material Facts ¶ 29; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 29.) In order to make this determination, Defendant Wartgow sought input from his staff including, Assistant Superintendent Andre Pettigrew. (*Id.*,

Statement of Undisputed Material Facts ¶ 30; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 30.)  Pettigrew testified that he suggested looking at "both administrators and teachers in terms of making changes at [NHS]." (*Id.*, Ex. A, Dep. of Andre Pettigrew at 62 [Dep. of Pettigrew].)  Defendant Wartgow also received an email from Defendant Hobbs requesting that certain staff members, including all of the Plaintiffs with the exception of Cecelia Walters, be reassigned from NHS to other schools.  (Pls.' Resp., Ex. 85 [5/14/03 Email From Def. Hobbs to Def. Wartgow Re: Request for Assistance].)

In July 2003, Defendant Wartgow discussed the transfers of various teachers with Patrick Mooney, the District's legal counsel.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 31; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 31.) Defendant Wartgow asked Mooney to "look at the situation."  (Pls.' Resp., Ex. 90 at 35 [Dep. of Mooney].)  Defendants contend that Defendant Wartgow relied upon Mooney's investigation and recommendations in determining which teachers to transfer.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 31.)  Mooney submitted his recommendations to Defendant Wartgow on July 14, 2003.  (Pls.' Resp., Ex. 91 [7/14/03 Letter From Mooney Re: Potential North High School Staff Transfers].)  Defendants contend that Defendant Wartgow decided to transfer Plaintiffs and Defendant Hobbs, based on these recommendations.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 33; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 33.)

-8-

### a.    *Facts Specific to Plaintiff Sedillos*

Plaintiff Sedillos has been a math teacher with the District for twelve years.  (Pls.' Resp.,

Statement of Additional Disputed Facts ¶ 20; *admitted at* Defs.' Reply Br. in Supp. of Mot. for

Summ. J., Resp. Concerning Disputed Facts ¶ 20 [filed Aug. 4, 2004] [hereinafter "Defs.'

Reply"].)  He taught at NHS for six years.  (*Id.*)

Plaintiff Sedillos spoke out regarding many issues and problems at NHS.  First, Plaintiff

Sedillos complained to Debus, Defendant Hobbs' supervisor, about Williams' conduct toward a

student who was suspended.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 35[a];

*admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 35[a], Ex. 21 ¶ 14 [Aff. of Pl.

Sedillos].)  After the student was exonerated of any wrongdoing, Plaintiff Sedillos informed the

student's parents of their right to request that the incident be expunged from the student's

records.  (*Id.*, Ex. A, Dep. of Michael Sedillos at 124–25 [Dep. of Pl. Sedillos].)

Plaintiff Sedillos also expressed concern about the principal selection process.  (Defs.'

Br., Statement of Undisputed Material Facts ¶ 35[b]; *admitted at* Pls.' Resp., Resp. to Statement

of Undisputed Facts ¶ 35[b].)  Specifically, Plaintiff Sedillos complained that the process was

not followed properly and that Defendant Hobbs' name was added to the list of candidates

without consulting the principal selection committee.  (*Id.*, Ex. A, Dep. of Michael Sedillos at

50–52 [Dep. of Pl. Sedillos].)  Plaintiff Sedillos expressed his complaints verbally to Debus and

the committee and then again in a letter dated April 25, 2003.  (*Id.*, Statement of Undisputed

Material Facts ¶ 35[b]; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 35[b].)

Plaintiff Sedillos complained to Defendant Wartgow that "[Defendant] Hobbs was

informed of a possible sexual harassment incident between a female student and a male member of

the teaching staff.  He chose to ignore it." (Pls.' Resp., Ex. 44 [4/25/03 Letter From Pl. Sedillos

to Def. Wartgow].)  Plaintiff Sedillos testified that he was not certain whether Defendant Hobbs

actually took action or ignored the situation.  (Defs.' Br., Ex. A, Dep. of Michael Sedillos at

62–66 [Dep. of Pl. Sedillos].)  There were concerns that Defendant Hobbs was intimidating the

girls who reported Williams' conduct.  (Pls.' Resp., Ex. 59 [2/19/03 Email From Ballenger Re:

Investigation].)

Plaintiff Sedillos further complained that "[Defendant] Hobbs is possibly using school

improvement plan money inappropriately." (Pls.' Resp., Ex. 44 [4/25/03 Letter From Pl.

Sedillos to Def. Wartgow].)  Plaintiff Sedillos was vocal about his disagreements with Defendant

Hobbs' criticism of the math department.  Plaintiff Sedillos testified that Defendant Hobbs

punished him by "berating me, humiliating me, forcing me to feel like I was being ashamed, his

questioning of my grades, attendance, his demeanor toward me, his slandering me in front of the

faculty." (Defs.' Br., Ex. A, Dep. of Michael Sedillos at 67 [Dep. of Pl. Sedillos].)  The members

of the math department filed a grievance against Defendant Hobbs regarding his criticism of (1)

their attendance at three public meetings, and (2) the "No D" policy of the math department. (*Id.*, Ex. A, Dep. of Michael Sedillos at 143 [Dep. of Pl. Sedillos].)

Plaintiff Sedillos expressed his concern regarding an alleged illegal raffle.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 35[g]; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 35[g].)  Plaintiff Sedillos complained to Defendant Hobbs and expressed his concern that the raffle was illegal and that holding it would endanger the Parent Teacher Student Association ("PTSA") bingo license.  (*Id.*)

Plaintiff Sedillos spoke out at meetings regarding other issues including: (1) changes to the coaching policy, (2) Williams' refusal to give students videotapes in order to apply for athletic scholarships, (3) Defendant Hobbs' alleged false public statement to other principals that "NHS has a policy of not allowing students the opportunity nor the permission to take textbooks home or out of the classroom," (4) Defendant Hobbs' policy allowing Williams to do whatever he wanted in the building, (5) Williams' alleged refusal to help student athletes whom he did not like with college scholarship opportunities, and (6) Defendant Hobbs' absence or tardiness at meetings, specifically a homecoming meeting with alumni.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 35[h–l]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶¶ 35[h–l].)

In late July, Plaintiff Sedillos received a document entitled "Superintendent-Initiated Administrative Transfer."  (Pls.' Resp., Statement of Additional Disputed Facts ¶ 26; *admitted at*

-11-

Defs.' Reply, Resp. Concerning Disputed Facts ¶ 26.)  Plaintiff Sedillos was replaced by a

person who does not have a professional teaching license.  (*Id.*)

### b.    *Facts Specific to Plaintiff Rhodes*

Plaintiff Rhodes has taught in the District for fourteen years.  (Pls.' Resp., Statement of

Additional Disputed Facts ¶ 28; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶

28.)  Plaintiff Rhodes spoke to Defendant Hobbs, Defendant Wartgow, and the public on many

issues and problems at NHS.  In October 2002, Plaintiff Rhodes spoke to Defendant Hobbs

regarding her perception of the unequal treatment of faculty members.  (Defs.' Br., Statement of

Undisputed Material Facts ¶ 36[a]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement

of Undisputed Facts ¶ 36[a].)  Plaintiff Rhodes testified that:

> the perception is, though, that some faculty members are going to get called on the
> carpet for trying to fix the door.  Someone else does the exact same things that you
> said not to do, paint, jams metal into a lock to stop people from coming in,
> creating a possible fire code violation, and nothing happens.  And he said he would
> work to change the perception of inequity.

(Defs.' Br., Ex. A, Dep. of Roxanne Rhodes at 61 [Dep. of Pl. Rhodes].)  In this October

meeting, Plaintiff Rhodes also expressed her concern that Williams fired all the assistant coaches.

(*Id.*, Statement of Undisputed Material Facts ¶ 36[a]; *admitted in relevant part at* Pls.' Resp.,

Resp. to Statement of Undisputed Facts ¶ 36[a].)

Plaintiff Rhodes complained to the CDM that Defendant Hobbs used "at-risk funds"[1] to pay a paraprofessional to work in the copy room rather than in the classroom. (*Id.*, Statement of Undisputed Material Facts ¶ 36[b]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 36[b].) Plaintiff Rhodes sent an electronic mail message to Defendant Wartgow complaining that it was irresponsible for Defendant Hobbs to use "at-risk" funds to pay a personal assistant, and that this misuse of funds had the direct result of denying this valuable asset to students in the classroom. (Pls.' Resp., Ex. 98 at 2 [4/20/03 Email From Pl. Rhodes to Defs. Wartgow and the Board of Education Re: NHS Crisis].)

In January 2003, Plaintiff Rhodes complained that Williams, who had been placed on administrative leave, was allegedly communicating with the faculty through Defendant Hobbs' weekly newsletter, the CODA. (*Id.*, Statement of Undisputed Material Facts ¶ 36[c]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 36[c].) Specifically, Plaintiff Rhodes complained that the January 2003 CODA quoted Williams stating "please let the staff know I contracted full blown pneumonia on the Christmas break and I am recovering slowly." (Pls.' Resp., Ex. 71 [CODA 1/13/03].) Plaintiff Rhodes complained that Defendant Hobbs' newsletter insinuated that Williams was out sick rather than on administrative leave. (*Id.*, Ex. 72 [1/17/03 Letter to Robin Kane].) Plaintiff Rhodes objected to the February CODA which announced the birth of Williams' son, and the March CODA which stated that the individual on

---

[1]"At-risk funds" were to be used for direct contact with students to improve their education. (Pls.' Resp., Ex. 34 ¶ 6 [Aff. of Cecilia Walters].)

administrative leave was "cleared of all allegations." (*Id.*, Ex. 72 at 8–9 [CODA 2/24/03],

[CODA 3/17/03].)

Plaintiff Rhodes objected to a flyer that was presented to the CDM entitled "Key

Accomplishments" which purported to list the key accomplishments Defendant Hobbs had made

since his arrival at NHS. (Defs.' Br., Ex. A, Dep. of Roxanne Rhodes at 140 [Dep. of Pl.

Rhodes].)  Plaintiff Rhodes prepared a rebuttal letter objecting to what she perceived as

Defendant Hobbs' attempt to take credit for things other people had done. (*Id.*, Statement of

Undisputed Material Facts ¶ 36[d]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement

of Undisputed Facts ¶ 36[d].)  Plaintiff Rhodes brought her rebuttal letter to the CDM meeting

and asked that it become part of the minutes. (*Id.*)

On April 7, 2003, Plaintiff Rhodes spoke publically at the "sticky note meeting." (*Id.*,

Statement of Undisputed Material Facts ¶ 36[e]; *admitted in relevant part at* Pls.' Resp., Resp.

to Statement of Undisputed Facts ¶ 36[e].)  Specifically, Plaintiff Rhodes complained that: (1)

many deadlines had been missed, (*id.*, Ex. A, Dep. of Roxanne Rhodes at 202–03 [Dep. of Pl.

Rhodes]); (2) NHS did not have teachers in their allocations, (*id.*); (3) Defendant Hobbs failed to

fill or post open faculty positions, leaving NHS without "the faculty and staff . . . needed to

educate students," (Pls.' Resp., Ex. 33 ¶ 8[b] [Pl. Rhodes' Resp. to Written Disc.]); (4)

Defendant Hobbs communicated dishonest and misleading information to the faculty and staff

regarding Williams, (*id.*, Ex. 33 ¶ 8[c] [Pl. Rhodes' Resp. to Written Disc.]); (5) Defendant

-14-

Hobbs' decision to permit Williams to use the internal electronic mail system while he was on administrative leave, (*id.*); and (6) Defendant Hobbs' public dishonesty regarding attendance rates at NHS. (*Id.*, Ex. 33 ¶ 8[d] [Pl. Rhodes Resp. to Written Disc.].)

On April 20, 2003, Plaintiff Rhodes sent Defendants Wartgow and the Board of Education an electronic mail message. (Defs.' Br., Statement of Undisputed Material Facts ¶ 36[f]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 36[f].) Plaintiff Rhodes listed four major areas of Defendant Hobbs' alleged "professional incompetence which have had an adverse effect on our ability to meet the needs of very vulnerable students." (Pls.' Resp., Ex. 98 [4/20/03 Email From Pl. Rhodes to Defs. Wartgow and the Board of Education].) These "areas" included: (1) Defendant Hobbs' failure to perform basic professional responsibilities, (2) Defendant Hobbs' alleged financial misconduct and irresponsibility, (3) Defendant Hobbs' public dishonesty, and (4) Defendant Hobbs' "unprofessional behavior." (*Id.*)

In late July 2003, Plaintiff Rhodes received a document entitled "Superintendent-Initiated Administrative Transfer." (Pls.' Resp., Statement of Additional Disputed Facts ¶ 31; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 31.) The teacher who replaced Plaintiff Rhodes had much less experience in teaching social studies than Plaintiff Rhodes. (*Id.*)

    *c.*    ***Facts Specific to Plaintiff Shepard's Speech***

Plaintiff Shepard has been a teacher in the District since 1998. (Pls.' Resp., Statement of Additional Disputed Facts ¶ 12; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 12.) Plaintiff Shepard earned state-wide recognition as an outstanding speech and debate coach and as a credit to NHS. (Pls.' Resp., Statement of Additional Disputed Facts ¶ 13; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 13.) Plaintiff Shepard spoke out on many issues and problems at NHS.

On November 8, 2002, Plaintiff Shepard wrote a letter to Defendant Wartgow, wherein she complained that her regular classroom was making her ill because of the chemicals emanating from the carpet. (Defs.' Br., Statement of Undisputed Material Facts ¶ 37[a]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 37[a].) She complained that the new administration at NHS denied her a new classroom. (*Id.*, Ex. 165 [11/8/02 Letter from Pl. Shepard to Def. Wartgow].) Plaintiff Shepard attached a handwritten letter to the November 8, 2002 correspondence. (Defs.' Br., Ex. 168 [Pl. Shepard's Handwritten Letter].) Plaintiff Shepard testified that in delivering this letter and its handwritten attachment to Defendant Wartgow, she was hoping he would be able to find out exactly what was going on at NHS and encourage or direct Defendant Hobbs to correct some of the policies that were not fulfilling his publicly stated mission. (*Id.*)

Plaintiff Shepard also opposed Williams' attempt to sign up students in a "football class." (*Id.*, Ex. A, Dep. of Bea Shepard at 91–93 [Dep. of Pl. Shepard].) Plaintiff Shepard

raised this issue at the CDM meeting in December.  (*Id.*)  Specifically, Plaintiff Shepard "asked the CDM to place a higher priority on academic activities than on sports activities with special attention to the question of sports or training class, and the forcible induction of students into the football program.  (*Id.*, Ex. A, Dep. of Bea Shepard at 93 [Dep. of Pl. Shepard].)  On October 31, 2002, Plaintiff Shepard told Debus "that this was going on, that kids were complaining about being recruited and being told to change their schedules for seventh period of class."  (Pls.' Resp., Ex. 121 at 100 [Dep. of Pl. Shepard].)

Plaintiff Shepard complained regarding inequity in the teachers' work schedule.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 37[e]; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 37[e].)  Defendant Wartgow added fifteen minutes to the school day which had to be put in the schedule in a block of time.  (*Id.*)  Defendant Hobbs decided to put the block of time at the end of the day so that teachers who had an eighth period class would have an extra fifteen minutes of either planning or student contact.  (*Id.*)  At a faculty meeting, Plaintiff Shepard complained that Defendant Hobbs should have equalized the schedule so that teachers would get equal planning time, thereby improving their academic program.  (Pls.' Resp., Ex. 121 at 80 [Dep. of Pl. Shepard].)

Plaintiff Shepard complained to Debus and Defendant Wartgow regarding (1) classes with no teacher, and (2) English classes that were staffed with substitute teachers as opposed to teachers with appropriate credentials.  (Defs.' Br., Ex. A, Dep. of Bea Shepard at 113–14 [Dep.

of Pl. Shepard].)  Plaintiff Shepard also expressed concern to Debus that the "at-risk"

paraprofessionals were not being used for the benefit of the "at-risk" students and their

educational program.  (*Id.*, Ex. A, Dep. of Bea Shepard at 117 [Dep. of Pl. Shepard].)

Finally, Plaintiff Shepard complained to Defendant Wartgow that she was not able to get

a school bus for a major speech tournament and that she felt she was singled out for inequitable

application of district rules.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 37[g];

*admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 37[g].)

On July 24, 2003, Plaintiff Shepard received a document entitled "Superintendent-

Initiated Administrative Transfer."  (Pls.' Resp., Statement of Additional Disputed Facts ¶ 18;

*admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 18.)  Plaintiff Shepard attempted

to obtain a teaching position at Kennedy High School, however, according to the principal there,

"downtown" refused to honor his request.  (*Id.*)  Thus, Plaintiff Shepard went to teach at

Montbello High School in an English Language Acquisition position for which she was not

qualified by certification, training, or experience.  (*Id.*)

### d.    *Facts Specific to Plaintiff Werner's Speech*

Plaintiff Werner taught art for three and one-half years at NHS.  (Pls.' Resp., Statement

of Additional Disputed Facts ¶ 1; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶

1.)  Her evaluations throughout this year were "very very good." (*Id.*)

Plaintiff Werner spoke out on many issues and problems at NHS following Defendant Hobbs' arrival.  On November 1, 2002, Plaintiff Werner sent an electronic mail message to Debus.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 38[a]; Ex. 87 [11/1/02 Email From Plaintiff Werner to Debus]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 38[a].)  In this electronic mail message Plaintiff Werner complained that: (1) she felt no trust or support with the administrative staff; (2) Defendant Hobbs had not visited her classroom once; (3) the students were not being treated with respect; (4) three fire alarms went off over the past week and the faculty, staff, and students were told not to evacuate the building; and (5) she feared for her safety.  (*Id.*, Ex. 87 [11/1/02 Email From Pl. Werner to Debus].)

Plaintiff Werner expressed concerns about Defendant Hobbs' misuse of an "at-risk" paraprofessional as his personal assistant at the community meeting held for Rob Hernandez, a City Council candidate.  (*Id.*, Statement of Undisputed Material Facts ¶ 38[d]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 38[d].)  At this same meeting, Plaintiff Werner expressed her concern that the student council class was not covered by an adult until late October 2002.  (*Id.*, Statement of Undisputed Material Facts ¶ 38[e]; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 38[e].)  Further, Plaintiff Werner spoke with Denver Classroom Teacher's Association ("DCTA") building representatives to express her concern about girls being sexually harassed by Williams and the lack of information provided to

the faculty about the situation.  (*Id.*, Statement of Undisputed Material Facts ¶ 38[g]; *admitted at*

Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 38[g].)

Finally, in electronic mail messages dated April 22, 2003, and April 24, 2003, Plaintiff

Werner complained to Debus about (1) inequitable treatment, (2) Defendant Hobbs' targeting of

some individuals, and (3) Defendant Hobbs' creation of a hostile environment.  (Pls.' Resp., Ex.

100 [Email Exchange Between Debus and Pl. Werner].)  Plaintiff Werner also complained about

these issues at the "sticky note meeting."  (Defs.' Br., Statement of Undisputed Material Facts ¶

38[h]; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 38[h].)

Prior to the start of the 2003–2004 school year, Plaintiff Werner received a document

entitled "Superintendent-Initiated Administrative Transfer."  (Pls.' Resp., Statement of

Additional Disputed Facts ¶ 7; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 7.)

Plaintiff Werner's direct placement was to Asbury Elementary School as a half-time art teacher

and half-time in-building substitute.  (Pls.' Resp., Statement of Additional Disputed Facts ¶ 8;

*admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 8.)  As a result of Plaintiff

Werner's transfer, NHS student enrollment in art dropped significantly.  (Pls.' Resp., Statement

of Additional Disputed Facts ¶ 11; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶

11.)

> ***e.*** ***Facts Specific to Plaintiff Walters***

From 1994 to 2001, Plaintiff Walters was the treasurer at NHS.  (*Id.*, Statement of

Additional Disputed Facts ¶ 32; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶

32.)  In April 2001, Plaintiff Walters became the head secretary at NHS.  (*Id.*)  Plaintiff Walters

was the head secretary at NHS until 2003, when she was transferred.  (*Id.*, Ex. 123 at 11 [Dep. of

Pl. Walters].)  Plaintiff Walters complained to Debus and others, including Mary Ann Baca, that

Defendant Hobbs (1) disregarded scheduled meetings, (2) consistently kept parents waiting up to

thirty minutes, (3) kept administrators waiting, (4) ignored district time-lines, and (5) failed to

prepare the North Central Accreditation Report on time.  (Pls.' Resp., Ex. 68 at 7 [Pl. Walters'

Resp. to Written Disc.]; Defs.' Br., Ex. A, Dep. of Cecelia Walters at 76, 85 [Dep. of Pl.

Walters].)

Plaintiff Walters complained to the central office, Debus, and Baca that Defendant Hobbs

delayed in getting a substitute for the student council class after Sara Flipse's resignation.  (Defs.'

Br., Statement of Undisputed Material Facts ¶ 39[b]; *admitted in relevant part at* Pls.' Resp.,

Resp. to Statement of Undisputed Facts ¶ 39[b].)  Additionally, Plaintiff Walters complained

that even though substitutes were hired to cover the electronics class, Defendant Hobbs took

several weeks to give Plaintiff Walters the authorization to post the position.  (Pls.' Resp., Ex.

123 at 122 [Dep. of Pl. Walters].)

Plaintiff Walters complained that Defendant Hobbs hired a teacher over the telephone

without first posting the position.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 39[c];

-21-

*admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 39[c].)  When

the new teacher showed up, Plaintiff Walters called the District Human Resources office to

advise them that the new teacher had not completed the application process, which includes a

background check, application, and finger printing.  (*Id.*, Ex. A, Dep. of Cecelia Walters at

135–36 [Dep. of Pl. Walters].)

**2.    *Procedural History***

On August 8, 2003, Plaintiffs filed their initial complaint in this court.  (Compl. and Jury

Demand [filed Aug. 8, 2003].)  Plaintiffs Sedillos, Rhodes, Werner, Shepard, and Walters asserted

a claim for retaliation for exercising their First Amendment rights in violation of 42 U.S.C. § 1983.

(*Id.* ¶¶ 89–96.)  Plaintiffs Sedillos, Rhodes, Werner, Shepard and the DCTA asserted a claim for

breach of the employment contract between them and Defendant Board of Education.  (*Id.* ¶¶

97–101.)

On August 8, 2003, Plaintiffs Sedillos, Shepard, Werner, and the DCTA, filed a motion

for a temporary restraining order.  (Pls.' Mot. for TRO [filed Aug. 8, 2003].)  On August 11,

2003, I denied Plaintiffs' motion because Plaintiffs did not show that "immediate and irreparable

injury, loss, or damage will result to [Plaintiffs] before the adverse party or that party's attorney

can be heard in opposition."  (Order [Aug. 1, 2003].)

On August 26, 2003, Plaintiffs filed an amended complaint.  (Am. Compl. and Jury

Demand [filed Aug. 26, 2003] [hereinafter "Am. Compl."].)  Plaintiff Walters added a breach of

-22-

contract claim. (*Id.* ¶¶ 130–38.) On September 15, 2003, Defendants filed an answer to

Plaintiffs' amended complaint. (Answer to Am. Compl. [filed Sept. 15, 2003].)

On September 15, 2003, Defendants filed a motion to dismiss Plaintiffs' second claim for

relief for lack of jurisdiction. (Defs.' Mot. to Dismiss Second Claim For Relief [filed Sept. 15,

2003].) On November 7, 2003, Defendants filed a motion to withdraw their motion to dismiss

Plaintiffs' second claim for relief for lack of jurisdiction. (Unopposed Mot. to Withdraw Defs.'

Mot. to Dismiss [filed Nov. 7, 2003].) On November 20, 2003, I granted Defendants'

unopposed motion to withdraw the motion to dismiss. (Order [Nov. 20, 2003].)

On February 2, 2004, Defendant Board of Education, filed a motion to permit limited

waiver of attorney-client privilege. (Mot. to Permit Limited Waiver of Att'y-Client Privilege

[filed Feb. 2, 2004] [hereinafter "Def. Board of Educ.'s Mot. to Permit Limited Waiver"].) On

March 4, 2004, Plaintiffs filed their response to Defendants' motion to permit limited waiver of

attorney-client privilege. (Pls.' Resp. to Defs.' Mot. to Permit Limited Waiver of Att'y-Client

Privilege [Mar. 4, 2004].) On April 14, 2004, the magistrate judge denied Defendants' motion to

permit limited waiver of attorney-client privilege. (Order [Apr. 14, 2004] [hereinafter

"Magistrate's Order"].) The magistrate judge determined that "[Defendant] Wartgow's decision

to place the advice of counsel in issue in this case is an affirmative act which has resulted in a

waiver of the attorney-client privilege with respect to the subject matter of that advice." (*Id.* at

5.)

On April 27, 2004, Defendant Board of Education filed an objection to the magistrate's order.  (Objection to Magistrate's Order Denying Mot. to Permit Limited Waiver of Att'y-Client Privilege [filed Apr. 27, 2004] [hereinafter "Defs.' Objection to Magistrate's Order"].)  On May 14, 2004, Plaintiffs filed a response to Defendants' objection to the magistrate judge's order denying Defendants' motion to permit limited waiver of attorney-client privilege.  (Pls.' Resp. to Objection to Magistrate's Order Denying Mot. to Permit Limited Waiver of Attorney-Client Privilege [filed May 14, 2004] [hereinafter "Pls.' Resp. to Defs.' Objection"].)  On May 27, 2004, Defendant Board of Education filed its reply in support of its objection to magistrate's order.  (Reply to Pls.' Resp. to Objection to Magistrate's Order Re: Limited Waiver of Att'y-Client Privilege [filed May 27, 2004] [hereinafter "Defs.' Reply in Supp. of Objection"].)

On April 8, 2004, Defendants filed their motion for summary judgment.  (Defs.' Br.)  Defendants argue that Plaintiffs' First Amendment claim fails because (1) Plaintiffs' alleged protected speech did not address matters of public concern; (2) the District had a right to regulate the manner of Plaintiffs' speech; (3) Plaintiffs' speech was not a substantial and motivating factor for their transfer; and (4) the District would have transferred Plaintiffs even in the absence of protected speech.  (*Id.* at 4.)  Further, Defendant Wartgow properly exercised his rights under the contract and Colorado statues.  (*Id.*)  Finally, Defendants Wartgow and Hobbs are entitled to qualified immunity as to Plaintiffs' First Amendment claims.  (*Id.*)  On June 14, 2004, Plaintiffs filed their response to Defendants' motion for summary judgment.  (Pls.' Resp. to Defs.' Mot.

for Summ. J. [filed June 14, 2004].)  On June 21, 2004, Plaintiff filed a corrected response to

Defendants' motion for summary judgment to comply with the court's special instructions.

(Pls.' Resp.)  On August 4, 2004, Defendants filed their reply in support of their motion for

summary judgment.  (Defs.' Reply.)  On September 17, 2004, Plaintiffs filed a surreply to

Defendants' motion for summary judgment.  (Pls.' Surreply on Defs.' Mot. for Summ. J. [filed

Sept. 17, 2004] [hereinafter "Pls.' Surreply"].)

On April 21, 2005, Plaintiffs filed a motion to reopen discovery for a limited purpose.

(Pls.' Mot. to Reopen Disc. For a Limited Purpose [filed Apr. 21, 2005] [hereinafter "Pls.' Mot.

to Reopen Disc."].)  On May 10, 2005, Defendants filed a response to Plaintiffs' motion to

reopen discovery for a limited purpose.  (Defs.' Resp. to Pls.' Mot. to Reopen Disc. For a

Limited Purpose [filed May 10, 2005] [hereinafter "Defs.' Resp. to Pls.' Mot. to Reopen

Disc."].)  Plaintiffs did not file a reply brief.

On April 21, 2005, Plaintiff Rhodes filed a motion for leave to file a second amended and

supplemental complaint.  (Pl. Rhodes' Mot. For Leave to File Second Am. and Supplemental

Compl. [filed Apr. 21, 2005] [hereinafter "Pl. Rhodes' Mot. for Leave to Am."].)  On May 10,

2005, Defendants filed a response to Plaintiff Rhodes' motion for leave to amend.  (Defs.' Resp.

to Pl. Rhodes' Mot. to File Second Am. and Supplemental Compl. [filed May 10, 2005]

[hereinafter "Defs.' Resp. to Pl. Rhodes' Mot. for Leave to Am."].)  Plaintiff Rhodes did not file

a reply brief.

## ANALYSIS

### 1.    *Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2003); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.'" *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record

must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*,

36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238,

1241 [10th Cir. 1990]).

**2.     *Plaintiffs' Section 1983 Claim***

Plaintiffs Sedillos, Shepard, Rhodes, Werner, and Walters allege that Defendants violated

section 1983 by retaliating against them for exercising their First Amendment rights to free

speech and association. (Am. Compl. ¶¶ 115–23.)

Section 1983 provides:

Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of
any State or Territory or the District of Columbia, subjects, or causes to be
subjected, any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an action at law, suit
in equity, or other proper proceeding for redress . . .

42 U.S.C.A. § 1983 (2004). To establish a claim under section 1983, a plaintiff must establish

(1) a deprivation of a federal or constitutional right by (2) a person acting under color of state

law.[2] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970). Section 1983 allows a plaintiff to

seek money damages from government officials who have violated his or her constitutional rights.

*Id.*

Government officials performing discretionary functions, however, are generally granted

qualified immunity and are "'shielded from liability for civil damages insofar as their conduct

[2]The parties do not dispute that Defendants are persons acting under color of state law.

-27-

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [1982]).  A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation.  *Id.* at 611.  If there is not a constitutional violation, then the defendants must prevail and there is no necessity for further inquiries concerning qualified immunity.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  On the other hand, if the facts (viewed in a light most favorable to Plaintiffs) show a violation of a constitutional right, then I must determine whether that right was clearly established.  *Id.*  I now address the First Amendment question.

### a.   *First Amendment Violation*

Plaintiffs claim that Defendants retaliated against them in violation of their First Amendment right of free speech and association.  (Am. Compl. ¶¶ 115–23.)  I evaluate Plaintiffs' allegations of free speech and association below.

### (1)   *Freedom of Speech*

"It is now axiomatic that a governmental entity cannot condition employment 'on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'"  *Schalk v. Gallemore*, 906 F.2d 491, 494 (10th Cir. 1990) (quoting *Connick v. Myers*, 461 U.S. 138, 142 [1983]).  In analyzing whether a public employer's actions impermissibly infringe on

free speech, the United States Supreme Court has adopted a multi-tier test. *Id.* at 494 (citing *Pickering v. Board of Educ. of Township High Sch. Dist. 205, Will County*, 391 U.S. 563, 568 [1968].)  First, the court must determine whether the employee's speech touches on a matter of public concern. *Id.*  Next, if the court answers the first question in the affirmative, the court must balance the employee's interest in making the statement against the employer's interest in promoting the efficiency of the public services it performs through its employees. *Id.*  The second step is colloquially referred to as the *Pickering* test. *Id.*  Third, if the preceding prerequisites are met, the speech is protected, and the plaintiff must show her expression was a motivating factor in the detrimental employment decision. *Id.* at 494–95.  Finally, if the plaintiff sustains this burden, the employer can still prevail if it shows by a preponderance of the evidence that it would have made the same decision regardless of the protected speech. *Id.* at 495.

### (A)   *Public Concern Analysis*

To determine whether employee speech touches on a matter of public concern, the court must look to whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146.  This requires an analysis of the content, form, and context of a given statement, in light of the record as a whole. *Id.* at 147–48.  "When the content of the speech focuses on disclosing public officials' malfeasance or wrongdoing, it is likely to be considered a matter of public concern." *Schalk*, 906 F.2d at 495

(citing *Wulf v. City of Wichita,* 883 F.2d 842, 857 [10th Cir.1989] [and cases cited therein]).

Conversely, speech is generally not protected if the aim is simply to air grievances of a purely personal nature. *Id.* A public employee is not protected when he criticizes his employer on grounds not of public concern. *Connick,* 461 U.S. at 147. The inquiry is whether the actor is speaking as a citizen or an employee. *Id.* In drawing the thin line between a public employee's speech that touches on matters of public concern, and speech from the same employee that only deals with personal employment matters, the Tenth Circuit looks to the subjective intent of the speaker. *McEvoy v. Shoemaker*, 882 F.2d 463, 466 (10th Cir.1989); *see also Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir.1988) (focus on motive of the speaker to determine whether speech was calculated to disclose misconduct). Moreover, even when speech could be a matter of public concern, it is not protected where the statements made are false. *Pickering*, 391 U.S. at 574; *Moore v. City of Wynnewood*, 57 F.3d 924, 932–33 (10th Cir. 1995). "[D]eliberately or recklessly false statements by public employees are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection." *Moore*, 57 F.3d at 933. I evaluate each Plaintiffs' respective speech in light of the standards expressed above.

### (a)  *Plaintiff Sedillos*

First, I evaluate the content of Plaintiff Sedillos' speech. Plaintiff Sedillos complained to the Northwest Area Administration and Debus that Williams' and Defendant Hobbs' conduct toward a student who was suspended was unfounded and in violation of the student's due

process rights. (Defs.' Br., Statement of Undisputed Material Facts ¶ 35[a]; *admitted at* Pls.'

Resp., Resp. to Statement of Undisputed Facts ¶ 35[a]; Ex. 21 ¶ 14 [Aff. of Pl. Sedillos].)

Plaintiff Sedillos' speech in this particular instance does relate to a "matter of political, social, or

other concern to the community." *See Connick*, 461 U.S. at 146. Plaintiff Sedillos' concern

regarding mismanagement and unfair treatment by school administrators and teachers is a matter

of public concern.

Second, Plaintiff Sedillos complained that the principal selection process was not

followed properly. (Defs.' Br., Statement of Undisputed Material Facts ¶ 35[b]; *admitted at*

Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 35[b].) This is not a matter of public

concern. This matter deals predominately with internal employment matters. *See McEvoy*, 882

F.2d at 466 (the plaintiff's letter complaining of internal politicking and favoritism was not

alleging misconduct, but simply mismanagement and inequities which are not matters of public

concern). Plaintiff Sedillos' comments as to this point are not alleging misconduct or malfeasance

on the part of Defendants, but simply citing inequities in the selection of a public school

principal.

Third, Plaintiff Sedillos complained to Defendant Wartgow that "[Defendant] Hobbs

[was] possibly using school improvement plan money inappropriately." (Pls.' Resp., Ex. 44

[4/25/03 Letter From Pl. Sedillos to Def. Wartgow].) Waste and inefficiency at a public

institutions are matters of public concern. *Schalk*, 906 F.2d at 495 (plaintiff's letter regarding

-31-

allegations of waste at a public hospital were matters of public concern).  Thus, Plaintiff Sedillos'

statements with respect to this issue are matters of public concern.

Third, Plaintiff Sedillos complained about Defendant Hobbs' policies directed at the math

department.  (Defs.' Br., Ex. A, Dep. of Michael Sedillos at 67 [Dep. of Pl. Sedillos].)  Plaintiff

Sedillos directed these complaints to the math department, Defendant Hobbs, Debus, the January

27, 2003 CDM meeting, and the April 7, 2003, climate meeting.  (Pls.' Resp. at 86.)  Specifically,

Plaintiff Sedillos criticized Defendant Hobbs' attempts to change the "no D policy."  (Defs.' Br.,

Ex. A, Dep. of Michael Sedillos at 143 [Dep. of Pl. Sedillos].)  Plaintiff Sedillos' speech as to this

point is not a matter of public concern.  Defendant Hobbs' position regarding the "no D policy"

was simply a management decision.  Defendant Hobbs was hired to improve the status of NHS

and his decision regarding the math departments' "no D policy," was simply a way to implement

the changes he perceived as necessary.  *See Gardetto v. Mason*, 100 F.3d 803, 813–14 (10th Cir.

1996) (holding that plaintiff's general criticisms of defendants' reduction in force plan are not

matters of public concern).  Thus, Plaintiff Sedillos' comments as to this issue do not touch on a

matter of public concern.

Fourth, Plaintiff Sedillos expressed his concern that a football raffle endorsed by

Defendant Hobbs was illegal under Colorado law.  (Defs.' Br., Statement of Undisputed Material

Facts ¶ 35[g]; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 35[g].)  Plaintiff

Sedillos contacted the Secretary of State's office to ensure that the PTSA bingo license was

disassociated from the alleged illegal raffle in order to protect the license.  (Pls.' Resp., Ex. 21 ¶

19 [Aff. of Pl. Sedillos].)  Plaintiff Sedillos' statements, expressing concern over perceived illegal

activities, constitute speech on a matter of public concern.  *See Patrick v. Miller*, 953 F.2d 1240,

1247–48 (10th Cir. 1992) (plaintiff's statements expressing concern over perceived illegal

budgeting activities concerned speech on a matter of public concern.).

Fifth, Plaintiff Sedillos complained to Debus that Williams refused to give students

videotapes in order to apply for athletic scholarships and Defendant Hobbs endorsed this policy.

(Defs.' Br., Statement of Undisputed Material Facts ¶ 35[i]; *admitted at* Pls.' Resp., Resp. to

Statement of Undisputed Facts ¶ 35[i].)  Defendants contend that Plaintiff Sedillos' complaints

regarding this activity were "complaints concerning the Principal's personnel decisions regarding

a fellow employee and did not rise to the level of public concern."  (*Id.* at 29.)  This argument is

incorrect.  Williams essentially created a policy that precluded students from obtaining

scholarships and admittance to colleges and universities.  Plaintiff Sedillos' concern regarding this

policy, and Defendant Hobbs' endorsement of such, was certainly a matter of public concern.

Thus, the content of following statements by Plaintiff Sedillos supports a holding that he

spoke on a matter of public concern: (1) Williams' and Defendant Hobbs' conduct toward a

student who was suspended in violation of the student's due process rights; (2) Defendant

Hobbs' alleged misuse of school improvement plan money; (3) Defendant Hobbs' endorsement

of an allegedly illegal football raffle; and (4) Defendant Hobbs' endorsement of Williams' policy

to preclude students from obtaining videotapes for college applications. Additionally, the fact that Plaintiff Sedillos did not make these statements while embroiled in a dispute over his employment status bolsters the conclusion that these statements touch on matters of public concern. *See Salge v. Edna Ind. Sch. Dist.*, 411 F.3d 178, 189 (5th Cir. 2005) (holding that when the content of the speech does not relate to the plaintiff's own employment it weighs in favor of speech regarding a matter of public concern). In fact, each of the statements was made following Defendant Hobbs' arrival at NHS and long before Plaintiff Sedillos' transfer.

The context under which these statements were made weighs in Plaintiffs' favor. Plaintiff Sedillos had been a math teacher with the District for twelve years. (Pls.' Resp., Statement of Additional Disputed Facts ¶ 20; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 20.) Plaintiff Sedillos' tenure at NHS and the District makes his speech on these issues of greater importance because of his familiarity with the issues faced by NHS and the District. *See Salge*, 411 F.3d at 189 (context factor weighs in favor of plaintiff because of tenure and knowledge of school district).

Finally, Plaintiff Sedillos made these statements publicly at meetings and privately to Debus and Defendant Wartgow. *See Facts* § 1(a), *supra*. The First Amendment's protection of government employees extends to private as well as public expression. *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415 n. 4 (1979) (noting that when a government employee

-34-

personally confronts his immediate supervisor, this speech may be protected).  Thus, the form of

Plaintiff Sedillos' speech supports a holding that he spoke on matters of public concern.

*(b)*     ***Plaintiff Rhodes***

First, I evaluate the content of Plaintiff Rhodes' alleged protected speech.  Plaintiff

Rhodes complained to the CDM and Defendant Wartgow that Defendant Hobbs used "'at-risk

funds' to pay a paraprofessional to work in the copy room rather than in the classroom."

(Defs.' Br., Statement of Undisputed Material Facts ¶ 36[b]; *admitted at* Pls.' Resp., Resp. to

Statement of Undisputed Facts ¶ 36[b].)  "At-risk funds" are education funds that are required to

be dedicated to helping "at-risk" students stay in school and improve their education standing.

(Pls.' Resp., Ex. 34 ¶ 6 [Aff. of Cecilia Walters].)  Misuse of state funds is a matter of public

concern.  *Hulen v. Yates*, 322 F.3d 1229, 1238 (10th Cir. 2003) (professors' speech regarding

misuse of state's funds are of interest to the public).  Thus, Plaintiff Rhodes' speech with

respect to this issue touches on a matter of public concern.

Second, Plaintiff Rhodes complained that Williams, who had been placed on

administrative leave, was allegedly communicating with the faculty through Defendant Hobbs'

weekly newsletter, the CODA.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 36[c];

*admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 36[c].)  Plaintiff Rhodes'

statements regarding this issue are not matters of public concern.  The gravamen of Plaintiff

Rhodes' complaint is that Defendant Hobbs' newsletter insinuated that Williams was sick rather

-35-

than on administrative leave and that individuals on administrative leave should not have

communication with the faculty. (*Id.*; Pls.' Resp., Ex. 72 [1/17/03 Letter to Robin Kane].) This

is essentially speech relating to an internal department dispute which essentially amounts to a

personal grievance outside of public concern. *See Sanguigni v. Pittsburgh Bd. of Public Educ.*,

968 F.2d 393, 395–96 (3rd Cir. 1992) (the statements that formed the basis of the plaintiff's

complaint appeared in a faculty newsletter and thus were not matters of public concern); *Finn v.*

*New Mexico*, 249 F.3d 1241, 1247 (10th Cir. 2001) (speech pertaining to internal personnel

disputes and working conditions is not speech on a matter of public concern).

On April 7, 2003, Plaintiff Rhodes spoke publically at the "sticky note meeting." (*Id.*,

Statement of Undisputed Material Facts ¶ 36[e]; *admitted in relevant part at* Pls.' Resp., Resp.

to Statement of Undisputed Facts ¶ 36[e].) Specifically, Plaintiff Rhodes complained that: (1)

many deadlines had been missed, (*id.*, Ex. A, Dep. of Roxanne Rhodes at 202–03 [Dep. of Pl.

Rhodes]); (2) NHS did not have teachers in their allocations, (*id.*); (3) Defendant Hobbs failed to

fill or post open faculty positions, leaving NHS without "the faculty and staff . . . needed to

educate students," (Pls.' Resp., Ex. 33 ¶ 8[b] [Pl. Rhodes' Resp. to Written Disc.]); (4)

Defendant Hobbs communicated dishonest and misleading information to the faculty and staff

regarding Williams, (*id.*, Ex. 33 ¶ 8[c] [Pl. Rhodes' Resp. to Written Disc.]); (5) Defendant Hobbs

wrongly permitted Williams to use the internal electronic mail system while he was on

administrative leave, (*id.*); and (6) Defendant Hobbs publicly disseminated dishonest information regarding attendance rates at NHS. (*Id.*, Ex. 33 ¶ 8[d] [Pl. Rhodes' Resp. to Written Disc.].)

Plaintiff Rhodes' statements on each of these issues, with the exception of Defendant Hobbs' decision to permit Williams to use the internal electronic mail system and Defendant Hobbs' alleged dishonest and misleading communication to the faculty and staff regarding Williams, are matters of public concern. These statements were made in a public forum, and relate to a matter of public concern — student education. A teachers' public criticism of a principal's or superintendents' conduct which directly affects students and student programs can be considered a matter of public concern. *See Tompkins v. Vickers*, 26 F.3d 603, 606–07 (5th Cir. 1994) (teacher's public criticism of principal's administration and policies regarding teachers and programs was a matter of public concern); *see also Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216, 222–23 (5th Cir. 1999) (The plaintiff's public criticism of the principal was a matter of public concern because it was not related to an employment squabble but was simply made in an effort to raise the level of education at the high school.). Plaintiff Rhodes' statements sought to bring to light actual or potential wrongdoing or breach of public trust on the part of Defendant Hobbs. *See Connick*, 461 U.S. at 148–49.

On April 20, 2003, Plaintiff Rhodes sent Defendants Wartgow and the Board of Education an electronic mail message. (Defs.' Br., Statement of Undisputed Material Facts ¶ 36[f]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 36[f].)

Plaintiff Rhodes listed four major areas of Defendant Hobbs' alleged "professional incompetence which have had an adverse effect on our ability to meet the needs of very vulnerable students." (Pls.' Resp., Ex. 98 [4/20/03 Email From Pl. Rhodes to Defs. Wartgow and the Board of Education].)  Plaintiff Rhodes specifically set forth examples of Defendant Hobbs' (1) failure to perform basic professional responsibilities, (2) financial misconduct and irresponsibility, (3) public dishonesty, and (4) unprofessional behavior resulting in an atmosphere of hostility, lack of trust, and low morale among teachers, students, and staff.  (*Id.*)  Plaintiff Rhodes' electronic mail message, with the exception of the fourth issue, included several complaints about which the community would be understandably concerned.  *See Wren v. Spurlock*, 798 F.2d 1313, 1317–18 (10th Cir. 1986) (teacher's letter regarding principal's questionable conduct and faculty concern over such conduct was a matter of public concern); *Bernheim v. Litt*, 79 F.3d 318, 325–26 (2d Cir. 1996) (Public school teacher's statements regarding quality of education provided by school, in reporting to authorities school principal's publication of false student test scores and misrepresentation of student achievements, concerned matter of public concern, and therefore such speech was protected by First Amendment.)  While low teacher and student morale is not normally a matter of public concern, *see Sanguigni*, 968 F.2d at 399, the overall concerns that Plaintiff Rhodes raised amounted to matters of public concern.

Thus, the content of the following statements by Plaintiff Rhodes supports a holding that she spoke on a matter of public concern: (1) complaints to the CDM and Defendant Wartgow

that Defendant Hobbs misused "at-risk funds;" (2) statements at the "sticky note meeting" as described above; (3) and Plaintiff Rhodes' April 20, 2003, complaints to Defendants Wartgow and the Board of Education via electronic mail message, with the exception of Plaintiff Rhodes' general complaints about the environment at NHS. The fact that Plaintiff Rhodes did not make these statements while embroiled in a dispute over her employment status adds support to the fact that these statements touch on matters of public concern. *See Salge*, 411 F.3d at 189 (holding that when the content of the speech does not relate to the plaintiff's own employment it weighs in favor of speech regarding a matter of public concern). Further, each of the statements were made following Defendant Hobbs' arrival at NHS and long before Plaintiff Rhodes' transfer.

The context under which these statements were made weighs in Plaintiffs' favor. At the time Plaintiff Rhodes made these statements, she had been teaching in the District for over fourteen years. (Pls.' Resp., Statement of Additional Disputed Facts ¶ 28; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 28.) Plaintiff Rhodes' tenure at NHS and the District makes her speech on these issues of greater importance because of her familiarity with the issues faced by the school district. *See Salge*, 411 F.3d at 189 (context factor weighs in favor of plaintiff because of tenure and knowledge of school district).

Finally, Plaintiff Rhodes made these statements publicly at meetings and privately to Defendants Wartgow and the Board of Education. *See Facts* § 1(b), *supra*. The First

Amendment's protection of government employees extends to private as well as public

expression.  *Givhan*, 439 U.S. at 415 n. 4 (noting that when a government employee personally

confronts his immediate supervisor, this speech may be protected).  Thus, the form of Plaintiff

Rhodes' speech supports a holding that he spoke on a matter of public concern.

### (c)    *Plaintiff Shepard*

First, I evaluate the content of Plaintiff Shepard's alleged protected speech.  On

November 8, 2002, Plaintiff Shepard wrote a letter to Defendant Wartgow, wherein she

complained that her regular classroom was making her ill because of the chemicals emanating from

the carpet.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 37[a]; *admitted in relevant*

*part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 37[a].)  She complained that the

new administration at NHS denied her a new classroom.  (Pls.' Resp., Ex. 165 [11/8/02 Letter

from Pl. Shepard to Def. Wartgow].)  Plaintiff Shepard attached a handwritten letter to the

November 8, 2002, correspondence.  (Defs.' Br., Ex. 168 [Pl. Shepard's Handwritten Letter].)

Plaintiff Shepard testified that in delivering this letter and its handwritten attachment to

Defendant Wartgow, she was hoping Defendant Wartgow would be able to find out exactly what

was going on at NHS and encourage or direct Defendant Hobbs to correct some of the policies

that were not fulfilling his publicly stated mission.  (*Id.*)  Plaintiff Shepard also requested that the

Northwest Area Superintendent's Office conduct an air quality test because of the chemical

vapors in her classroom.  (Pls.' Resp., Ex. 97 at 6 [Pl. Shepard's Resp. to Written Disc.].)  The

air quality test did not happen until Plaintiff Shepard contacted the Environmental Protection

Agency ("EPA") a month later.  (*Id.*, Ex. 97 at 6–7 [Pl. Shepard's Resp. to Written Disc.].)

Plaintiff Shepard's complaints about the hazardous conditions at NHS and the administration's

refusal to address them clearly dealt with matters of public concern.  *See Luethje v. Peavine Sch.*

*Dist. of Adair County*, 872 F.2d 352, 355 (10th Cir. 1989) (plaintiff's complaints about

unsanitary practices in the school's cafeteria and the administration's refusal to address them

clearly dealt with matters of public concern); *Johnsen v. Ind. Sch. Dist. No. 3 of Tulsa County*,

891 F.2d 1485, 1490 (10th Cir. 1989) (school policy which potentially impacts the health of the

children attending school is a matter of public concern).

     In December 2002, Plaintiff Shepard spoke at a CDM meeting regarding Williams'

attempt to sign up students in a "football class."  (Defs.' Br., Ex. A, Dep. of Bea Shepard at

91–93 [Dep. of Pl. Shepard].)  Plaintiff Shepard "asked the CDM to place a higher priority on

academic activities than on sports activities with special attention to the question of sports or

training class, and the forcible induction of students into the football program."  (*Id.*)  Plaintiff

Shepard's speech on this issue is not a matter of public concern.  Plaintiffs have not alleged that

NHS put more money toward athletics than academics or that the alleged "football class" affected

the academics as NHS.  *But cf. Pickering*, 391 U.S. at 571 (a teacher's public criticism of the

school board's allocation of funds between academics and athletics is a matter of public concern).

Here, Plaintiff Shepard's disagreement with Williams' implementation of a football class is, at

best, an internal dispute.  Plaintiffs Shepard's comments as to this point are not alleging

misconduct or malfeasance on the part of Defendants, but simply citing her disagreement with a

sports or training class.  *See Schalk*, 906 F.2d at 495 (citing *Wulf,* 883 F.2d at 857).

Next, Plaintiff Shepard complained regarding inequity in the teachers' work schedule.

(Defs.' Br., Statement of Undisputed Material Facts ¶ 37[e]; *admitted at* Pls.' Resp., Resp. to

Statement of Undisputed Facts ¶ 37[e].)  Defendant Wartgow mandated the public schools to

add fifteen minutes in the school schedule in a block of time and Defendant Hobbs added the time

to the end of the school day so teachers who had an eighth period class had an extra fifteen

minutes of either planning or student contact. (*Id.*)  At a faculty meeting, Plaintiff Shepard

complained that Defendant Hobbs should have equalized the schedule so that teachers would get

equal planning time, thereby improving their academic program.  (Pls.' Resp., Ex. 121 at 80 [Dep.

of Pl. Shepard].)  Plaintiff Shepard's statements as to this issue do not touch on matters of

public concern.  Defendant Hobbs had discretion to structure the school day as he deemed

appropriate and Plaintiff Shepard's disagreement with that decision is merely an internal dispute

and grievance.  *See Finn*, 249 F.3d at 1247 (speech pertaining to internal personnel disputes and

working conditions is not speech on a matter of public concern).

Next, Plaintiff Shepard complained to Debus and Defendant Wartgow regarding (1)

classes with no teachers, and (2) English classes that were staffed with substitute teachers as

opposed to teachers with appropriate credentials.  (Defs.' Br., Ex. A, Dep. of Bea Shepard at

113–14 [Dep. of Pl. Shepard].)  Plaintiff Shepard complained about Defendant Hobbs' failure to post open positions and fill them with qualified individuals.  (*Id.*)  These statements address matters of public concern.  Certainly, if students are not being taught by teachers who are qualified to teach, then the public has an interest in knowing.  *Mazurek v. Wolcott Bd. of Educ.*, 849 F. Supp. 154, 156 (D. Conn. 1994) (substitute teacher's complaints regarding the caliber of teachers and the school's hiring practice was a matter of public concern).

Finally, Plaintiff Shepard complained to Defendant Wartgow about not being able to get a school bus for a major speech tournament, and that she was singled out for inequitable application of district rules.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 37[g]; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 37[g].)  Additionally, Plaintiff Shepard complained to Larry Padilla, the Athletic Director, when she failed to get a wheelchair bus for a wheelchair-bound debater.  (*Id.*)  These complaints are not matters of public concern.  Plaintiffs Shepard's comments as to this point are not alleging misconduct or malfeasance on the part of Defendants.  *See Schalk*, 906 F.2d at 495.  In fact, Plaintiffs have not demonstrated how Plaintiff Shepard's comments apply to any named Defendant in this case.  Plaintiff Shepard's complaints seem to be her personal frustrations regarding the internal bureaucracy at NHS as opposed to a matter of public concern.

Thus, the content of the following statements by Plaintiff Shepard relate to a matter of public concern: (1) complaints regarding her regular classroom making her ill because of the

chemicals emanating from the carpet; and (2) complaints regarding classes without teachers or classes staffed with unqualified teachers.  Moreover, the fact that Plaintiff Shepard did not make these statements while embroiled in a dispute over her employment status bolsters the fact that these statements touch on matters of public concern.  *See Salge*, 411 F.3d at 189 (holding that when the content of the speech does not relate to the plaintiff's own employment it weighs in favor of speech regarding a matter of public concern).

The context under which these statements were made weighs in Plaintiffs' favor.  At the time Plaintiff Shepard made these statements, she had been teaching in the District for five years. (Pls.' Resp., Statement of Additional Disputed Facts ¶ 12; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 12.)  Plaintiff Shepard's tenure at the District makes her speech on these issues of greater importance because of her familiarity with the issues faced by the school district.  *See Salge*, 411 F.3d at 189 (context factor weighs in favor of plaintiff because of tenure and knowledge of school district).

Finally, Plaintiff Shepard made these statements publicly, at meetings and to the EPA, and privately to Defendants Wartgow and the Board of Education.  *See Facts* § 1(c), *supra*.  The First Amendment's protection of government employees extends to private as well as public expression.  *Givhan*, 439 U.S. at 415 n. 4 (noting that when a government employee personally confronts his immediate supervisor, this speech may be protected).  Thus, the form of Plaintiff Shepards' speech supports a holding that she spoke on a matter of public concern.

### *(d)     Plaintiff Werner*

First, I evaluate the content of Plaintiff Werner's alleged protected speech.  On November

1, 2002, Plaintiff Werner sent an electronic mail message to Debus.  (Defs.' Br., Statement of

Undisputed Material Facts ¶ 38[a]; Ex. 87 [11/1/02 Email From Pl. Werner to Debus]; *admitted*

*in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 38[a].)  In this

electronic mail message Plaintiff Werner complained that: (1) she felt no trust or support with the

administrative staff; (2) Defendant Hobbs had not visited her classroom once; (3) the students

were not being treated with respect; (4) three fire alarms went off over the past week and the

faculty, staff, and students were told not to evacuate the building; and (5) she feared for her

safety.  (*Id.*, Ex. 87 [11/1/02 Email From Pl. Werner to Debus].)  The first three items Plaintiff

Werner addressed in this letter are not matters of public concern.  These statements relate to

Plaintiff Werner's general feelings regarding the environment and morale at NHS.  *See Connick,*

461 U.S. at 148 (holding that employee's questions related to workers' trust in their supervisors,

office morale, and the need for a grievance committee were mere extensions of employee's protest

over her transfer to another department and as such did not relate to a matter of public concern);

*Sanguigni,* 968 F.2d at 399 (teacher's statements that focused solely on employee morale did not

relate to matters of public concern).

Plaintiff Werner's statements regarding three malfunctioning fire alarms and her safety

concern are matters of public concern.  Plaintiff Werner's complaints about the hazardous

conditions at NHS and the administration's refusal to address them clearly dealt with matters of public concern. *See Luethje*, 872 F.2d at 355 (plaintiff's complaints about unsanitary practices in the school's cafeteria and the administration's refusal to address them clearly dealt with matters of public concern); *see also Johnsen*, 891 F.2d at 1490 (school policy which potentially impacts the health of the children attending school is a matter of public concern).

At a community meeting held for Rob Hernandez, a candidate for City Council, Plaintiff Werner expressed her concern about Defendant Hobbs' misuse of an "at-risk" paraprofessional as his personal assistant. (*Id.*, Statement of Undisputed Material Facts ¶ 38[d]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 38[d].) Additionally, Plaintiff Werner complained to DCTA representatives that funds were being misused by Defendant Hobbs. (Pls.' Resp., Ex. 87 at 4–5 [Pl. Werner's Resp. to Written Disc.].) Misuse of state funds is a matter of public concern. *Hulen*, 322 F.3d at 1238 (professors' speech regarding misuse of state's funds are of interest to the public). Thus, Plaintiff Werner's speech with respect to this issue was a matter of public concern.

Plaintiff Werner complained that the faculty lacked information about the investigation of Williams' alleged sexual harassment. (Defs.' Br., Statement of Undisputed Material Facts ¶ 38[g]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 38[g].) The investigation into the alleged sexual harassment of a student by Williams was a confidential matter which neither the public nor the faculty has any right or interest. Confidentiality is a

factor in determining whether speech involved a matter of public concern. *Burley v. Wyoming Dep. of Family Serv.*, No. 02–8057, 2003 10th Cir. WL 1880640, at *3 (10th Cir. 2003).   Thus, Plaintiff Werner's complaints regarding the investigation of Williams do not touch on matters of public concern.

Finally, Plaintiff Werner complained in electronic mail messages dated April 22, 2003, and April 24, 2003, about: (1) inequitable treatment, (2) Defendant Hobbs' targeting of some individuals, and (3) Defendant Hobbs' creation of a hostile environment.  (Pls.' Resp., Ex. 100 [Email Exchange Between Debus and Pl. Werner].)  Plaintiff Werner also complained about these issues at the "sticky note meeting." (Defs.' Br., Statement of Undisputed Material Facts ¶ 38[h]; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 38[h].)  These statements are not of public concern.  These statements deal with individual disputes and grievances and this information would not necessarily be helpful to the public's evaluation of Defendant Hobbs.  *See McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) (speech is not of public concern when it deals with individual personnel disputes and grievances).

Thus, the content of the following statements by Plaintiff Werner relate to a matter of public concern: (1) statements regarding three malfunctioning fire alarms and the safety of the school; and (2) Defendant Hobbs' alleged misuse of "at-risk" funds.  Moreover, the fact that Plaintiff Werner did not make these statements while embroiled in a dispute over her

employment lends credence to the fact that the content of these statements touch on matters of public concern.

Additionally, the context under which Plaintiff Werner made these statements weighs in Plaintiffs' favor. Plaintiff Werner taught art for three and one-half years at NHS. (Pls.' Resp., Statement of Additional Disputed Facts ¶ 1; *admitted at* Defs.' Reply., Resp. Concerning Disputed Facts ¶ 1.) Her evaluations throughout this year were "very very good." (*Id.*) Plaintiff Werner's status at NHS and her level of success make her speech on these issues of greater importance because of her familiarity with the needs of NHS. *See Salge*, 411 F.3d at 189 (context factor weighs in favor of plaintiff because of tenure and knowledge of school district).

Finally, Plaintiff Werner made these statements publicly to candidates for City Council, to DCTA representatives, and privately to Debus. *See Facts* § 1(d), *supra*. The First Amendment's protection of government employees extends to private as well as public expression. *Givhan*, 439 U.S. at 415 n. 4 (noting that when a government employee personally confronts his immediate supervisor, this speech may be protected). Thus, the form of Plaintiff Werner's speech supports a holding that she spoke on a matter of public concern.

### (e)   *Plaintiff Walters*

First, I evaluate the content of Plaintiff Walters' speech. Plaintiff Walters complained to Debus and others, including Mary Ann Baca, that Defendant Hobbs (1) disregarded scheduled meetings, (2) consistently kept parents waiting up to thirty minutes, (3) kept administrators

waiting, (4) ignored district time-lines, and (5) failed to prepare the North Central Accreditation

Report on time.  (Pls.' Resp., Ex. 68 at 7 [Pl. Walters' Resp. to Written Disc.]; Defs.' Br., Ex. A,

Dep. of Cecelia Walters at 76, 85 [Dep. of Pl. Walters].)  With respect to the first three

allegations, Plaintiff Walters' complaints do not touch on matters of public concern.  These

statements concerning mismanagement of NHS are essentially complaints about management

incompetence and do not relate to a matter of public concern.  *See Brown v. City of Trenton*, 867

F.2d 318, 322 (6th Cir. 1989) ("grievances were essentially those of in-house people dissatisfied

with the chief's leadership of their group").  Plaintiff Walters' statements regarding Defendant

Hobbs' disregard for district time-lines and Defendant Hobbs' failure to prepare the North

Central Accreditation Report are matters of public concern.  Plaintiff Walters' allegations

regarding Defendant Hobbs' conduct, if true, fly in the face of the purpose for which he was

hired — to make improvements to NHS and prevent the State of Colorado from converting NHS

to a charter school.  (Defs.' Br., Statement of Undisputed Material Facts ¶¶ 3, 5, 7; *admitted at*

Pls.' Resp., Resp. to Statement of Undisputed Facts ¶¶ 3, 5, 7.)

Plaintiff Walters complained to the central office, Debus, and Baca that Defendant Hobbs

delayed in getting a substitute for the student council class after Sara Flipse's resignation.  (Defs.'

Br., Statement of Undisputed Material Facts ¶ 39[b]; *admitted in relevant part at* Pls.' Resp.,

Resp. to Statement of Undisputed Facts ¶ 39[b].)  Additionally, Plaintiff Walters complained

that even though substitutes were hired to cover the electronics class, Defendant Hobbs took

several weeks to give Plaintiff Walters the authorization to post the position. (Pls.' Resp., Ex. 123 at 122 [Dep. of Pl. Walters].) These statements address matters of public concern. Certainly, a principal's unreasonable delay in hiring qualified teachers and leaving classes without adult supervision is a matter of public concern. *Mazurek*, 849 F. Supp. at 156 (substitute teacher's complaints regarding the caliber of teachers and the school's hiring practice was a matter of public concern).

Plaintiff Walters complained that Defendant Hobbs hired a teacher over the telephone without first posting the position. (Defs.' Br., Statement of Undisputed Material Facts ¶ 39[c]; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Facts ¶ 39[c].) When the new teacher showed up, Plaintiff Walters called the District Human Resources office to advise them that the new teacher had not completed the application process, including a background check, an application, or finger printing. (*Id.*, Ex. A, Dep. of Cecelia Walters at 135–36 [Dep. of Pl. Walters].) Plaintiff Walters' speech regarding this issue touches on a matter of public concern because student safety is at issue. The public has an interest in knowing if a public school principal is hiring teachers without doing background checks or following the outlined application process, thereby jeopardizing student safety. *See Mazurek*, 849 F. Supp. at 156 (substitute teacher's complaints regarding the caliber of teachers and the school's hiring practice was a matter of public concern). Accordingly, Plaintiff Walters' complaints regarding this issue touch on matters of public concern.

Thus, the content of the following statements by Plaintiff Walters relate to matters of public concern: (1) statements regarding Defendant Hobbs' disregard for district time-lines; (2) statements regarding Defendant Hobbs' failure to prepare the North Central Accreditation Report; (3) statements regarding Defendant Hobbs' delay in hiring qualified teachers and leaving classes without adult supervision; and (4) statements regarding Defendant Hobbs' failure to follow proper hiring procedure. Moreover, the fact that Plaintiff Walters did not make these statements while embroiled in a dispute over her employment lends credence to the fact that the content of these statements touch on matters of public concern. *See Salge*, 411 F.3d at 189 (holding that when the content of the speech does not relate to the plaintiff's own employment it weighs in favor of speech regarding a matter of public concern).

Additionally, the context under which Plaintiff Walters made these statements weighs in Plaintiffs' favor. Plaintiff Walters worked at NHS for over nine years. (Pls.' Resp., Statement of Additional Disputed Facts ¶ 32; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 32.) Thus, Plaintiff Walters' tenure at NHS makes her speech on these issues of greater importance because of her familiarity with the needs of NHS. *See Salge*, 411 F.3d at 189 (context factor weighs in favor of plaintiff because of tenure and knowledge of school district).

Finally, Plaintiff Walters made these statements to Debus, Defendant Hobbs, and Baca. *See Facts* § 1(e), *supra*. The First Amendment's protection of government employees extends to private as well as public expression. *Givhan*, 439 U.S. at 415 n. 4 (noting that when a

government employee personally confronts his immediate supervisor, this speech may be

protected). Thus, the form of Plaintiff Werner's speech supports a holding that she spoke on a

matter of public concern.

> **(B)** **_Pickering Balancing: Employee Free Speech Versus Employer's Interest In Efficiency_**

Once the court determines an employee's speech touches on a matter of public concern,

the court must balance the employee's interest in making the statement against the public

employer's interest in the effective and efficient fulfillment of its responsibilities to the public.

_Rankin v. McPherson_, 483 U.S. 378, 388 (1987). I must consider whether Plaintiffs'

"statement[s] impair[] discipline by superiors or harmony among co-workers, ha[ve] a

detrimental impact on close working relationships for which personal loyalty and confidence are

necessary, or impede[] the performance of the speaker's duties or interfere[] with the regular

operation of the enterprise." _Id._ To prevail in the _Pickering_ balancing, "defendants must show

'evidence of an actual disruption of [NHS's] services resulting from the speech at issue.'" _Powell_

_v. Gallentine_, 992 F.2d 1088, 1091 (10th Cir. 1993) (quoting _Melton v. City of Oklahoma City_,

879 F.2d 706 [10th Cir. 1989], _overruled on other grounds_, 928 F.2d 920 [10th Cir. 1991].)

When the adverse employment action occurs several months after the employee speaks out

against the employer, the Tenth Circuit has held that the defendant must show "actual

disruption." _Kent v. Martin_, 252 F.3d 1141, 1145 (10th Cir. 2001). Absent evidence of an

"actual disruption," the fact that an administrator was offended by the employee's speech tips

the balance in favor of the plaintiff. *Powell*, 992 F.2d at 1091.  In striking the balance between the employer's and the employee's respective interests, courts must "'consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees.'" *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994) (citing *Rankin,* 483 U.S. at 388), *cert. denied*, 513 U.S. 947 (1994).  Below, I evaluate each Plaintiffs' interest in engaging in the speech that touch on matters of public concern against the state's interest as a employer in "promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

### (a)    Plaintiff Sedillos

As described above, some of Plaintiff Sedillos' complaints and comments touched on matters of public concern. *Analysis*, § 2(a)(1)(A)(a), *supra*.  Defendants argue that "[f]rom [Plaintiff] Sedillos' Answers to Interrogatories, it is clear that his remarks caused both actual and potential disruption." (Defs.' Br. at 38.)  When the adverse employment action occurs several months after the employee speaks out against the employer, the Tenth Circuit has held that the defendant must show "actual disruption." *Kent*, 252 F.3d at 1145.  It is not enough for Defendants to show a "potential" disruption.  In support of their argument that Plaintiff Sedillos caused actual disruption, Defendants allege that Plaintiff Sedillos: (1) verbally opposed

Defendant Hobbs' attempts to change the long-standing "no D policy;" (2) participated in a grievance filed by the Math Department; (3) confronted Defendant Hobbs at a faculty meeting and "expressed the opinion that Defendant Hobbs had to go;" and (4) told Defendant Wartgow that he "no longer trusts the process nor believes in the system." (Defs.' Br. at 38–39.) Defendants fail to explain how any of these instances of conduct disrupted the education process at NHS. Defendants contend that "[Plaintiff] Sedillos' verbal opposition to changing the policies in the Math Department can certainly be understood to have endangered the efficient delivery of education." (*Id.* at 38.) Defendants' conclusory allegations, without more, are insufficient to prevail on their motion for summary judgment as to this point. *Hicks v. City of Watonga, Oklahoma*, 942 F.2d 737, 743 (10th Cir. 1991); *Woodward v. City of Woodward*, 977 F.2d 1392, 1398 (10th Cir. 1992).

Further, the fact that Plaintiff Sedillos participated in two grievances and spoke out at faculty meetings does not demonstrate actual disruption. Rather, grievances are the agreed-upon method, under the collective bargaining agreement, for faculty to resolve complaints. (Pls.' Resp., Ex. 73, Article 7 [Collective Bargaining Agreement].) Additionally, the purpose of the CDM meetings which Plaintiff Sedillos spoke at, is for staff, parents, students, and community members to work together to create and implement a school plan focused on the unique needs of the students in the school. (Pls.' Resp., Statement of Additional Disputed Facts ¶ 71; *admitted in relevant part at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 71.) Thus, on balance,

-54-

Defendants' interest in an efficient operation of the school does not outweigh Plaintiff Sedillos'

interests in speaking about the matters of public concern outlined above.

### (b)   *Plaintiff Rhodes*

As described above, some of Plaintiff Rhodes' complaints and comments touched on

matters of public concern. *Analysis*, § 2(a)(1)(A)(b), *supra*.  Defendants argue that "[t]he

administration had a legitimate desire to prevent the continuous attacks on . . . [Defendant]

Hobbs and his attempts to reform [NHS] and thus, even if [Plaintiff] Rhodes raised some issues

of public concern, they were outweighed by the potential and actual disruption to NHS that

year." (Defs.' Br. at 40.)  Again, Defendants must show more than potential disruption.  *See*

*Kent*, 252 F.3d at 1145.  In support of their allegations of actual disruption, Defendants cite to

(1) an October 2002 meeting with Defendant Hobbs, (2) a letter Plaintiff Rhodes submitted at the

February 2003 CDM meeting, and (3) an April 20, 2003 letter Plaintiff Rhodes sent to

Defendants Wartgow and the Board of Education.  (Defs.' Br. at 39.)  Defendants do not describe

how any of these letters or the October 2002 meeting caused an actual disruption in the education

of students or disrupted governmental functions in any way.  Instead, Defendants repeatedly

state that Plaintiff Rhodes' complaints were "continuous," (*id.* at 39–40), yet they fail to explain

how these "continuous" actions disrupted governmental functions.  Defendants' conclusory

allegations, without more, are not enough to prevail on their motion for summary judgment as to

this issue.  *Hicks*, 942 F.2d at 743; *Woodward*, 977 F.2d at 1398.  Moreover, Defendant Hobbs

testified that he could not think of one change he attempted to implement that Plaintiff Rhodes tried to stop. (Pls.' Resp., Ex. 40 at 127–28 [Dep. of Def. Hobbs].) Thus, on balance, Defendants' interest in an efficient operation of the school do not outweigh Plaintiff Rhodes' interests in speaking about the matters of public concern outlined above.

### (c) Plaintiff Shepard

As described above, some of Plaintiff Shepard's complaints and comments touched on matters of public concern. *Analysis*, § 2(a)(1)(A)(c), *supra*. Defendants' sole argument regarding Plaintiff Shepard's alleged disruption is that "[h]er comments not only could reasonably have endangered the relationships and confidence between . . . [Defendant] Hobbs and the faculty, but the students as well." (Defs.' Br. at 40.) First, as described above, Defendants must show actual disruption. *See Kent*, 252 F.3d at 1145. Second, Defendants do not describe how Plaintiff Shepard's speech disrupted the education of students or governmental functions. Again, Defendants' conclusory allegations, without more, are not enough to prevail on their motion for summary judgment as to this issue. *Hicks*, 942 F.2d at 743; *Woodward*, 977 F.2d at 1398. Thus, on balance, Defendants' interest in an efficient operation of the school do not outweigh Plaintiff Shepard's interests in speaking about the matters of public concern outlined above.

### (d) Plaintiff Werner

As described above, some of Plaintiff Werner's complaints and comments touched on matters of public concern. *Analysis*, § 2(a)(1)(A)(d), *supra*. Defendants' argument regarding

Plaintiff Werner's actual disruption of affairs at NHS consists of four sentences with one only citation to the record.[1]  (Defs.' Br. at 40.)  Specifically, Defendants assert that:

> [Plaintiff] Werner's complaints . . . grew out of her dislike of . . . [Defendant] Hobbs and his manner of dealing with her. . . .Although her complaints were dealt with by the administration, she continued to express them in a manner disrespectful of Defendant Hobbs.  (p. 25) [sic].  Her defiance when she threw papers in the air and shouted an obscenity have no place in a public school and thus the District's interest outweigh [sic] any of [Plaintiff] Werner's protected speech.

(*Id.*)  Absent evidence of an "actual disruption," the fact that an administrator was offended by the employee's speech tips the balance in favor of the plaintiff.  *Powell*, 992 F.2d at 1091.

Further, Defendants' argument, as set forth above, does not describe any of Plaintiff Werner's specific conduct or any specific comments Plaintiff Werner made.  Again, Defendants' conclusory allegations, without more, are not enough to prevail on their motion for summary judgment as to this issue.  *Hicks*, 942 F.2d at 743; *Woodward*, 977 F.2d at 1398.  Thus, on balance, Defendants' interest in an efficient operation of the school does not outweigh Plaintiff Werner's interests in speaking about the matters of public concern outlined above.

### (e)    *Plaintiff Walters*

As described above, some of Plaintiff Walters' complaints and comments touched on matters of public concern.  *Analysis*, § 2(a)(1)(A)(e), *supra*.  Defendants argue that Plaintiff

---

[1]Defendants cite to "p. 25." in support of their argument regarding Plaintiff Werner. (Defs.' Br. at 40.)  Page twenty-five of Defendants' brief sets forth the four pronged test used to evaluate First Amendment claims.  (*Id.* at 25.)  Indeed, page twenty-five does not mention Plaintiff Werner's name.  (*Id.*)  Thus, I will ignore Defendants' citation to page twenty-five as to this point.

Walters' speech is not entitled to protection because when balanced against the interests of NHS, "the interests of the [District] which lie in having a school secretary loyal to and trusted by the Principal in order to assure that the office functions smoothly, overwhelm" Plaintiff Walters' interests in free speech. (Defs.' Br. at 41.)  In support, Defendants contend that

> [Plaintiff] Walters' disruption is illustrated by the fact that the office staff was so divided that a fellow worker reported that [Plaintiff] Walters made an obscene gesture behind the back of [Defendant] Hobbs.  Whether that actually happened or not, the division among the staff in part caused by [Plaintiff] Walters' speech, contributed to the disruption experienced by NHS that year.

(*Id.*)  Mere speculation regarding Plaintiff Walters' activities is not enough to show an actual disruption in the governmental process.  *Gardetto*, 100 F.3d at 815–16 (holding that an employer cannot rely on "purely speculative allegations that certain statement caused or will cause disruption.").  Defendants do not offer any evidence that Plaintiff Walters' speech actually disrupted the governmental process.  Thus, on balance, Defendants' interest in an efficient operation of the school does not outweigh Plaintiff Walter's interests in speaking about the matters of public concern outlined above.

### (C)    Plaintiffs' Speech Was a Substantial or Motivating Factor in Defendants' Decision to Transfer Plaintiffs

Next, Plaintiffs must show that Defendants' decision to transfer them was motivated, at least in part, by the exercise of their free speech rights.  *Finn*, 249 F.3d at 1247; *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000).  The nonmoving party may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to

prevent. *Cockrel v. Shelby County Sch. Dist.*, 270 f.3d 1036, 1055 (6th Cir. 2001). Rather,

Plaintiffs must link the speech in question to Defendants' decision to transfer them. *Wright v.*

*Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1500 (7th Cir. 1994). In other words,

to survive Defendants' motion for summary judgment, Plaintiffs must present sufficient evidence

to allow a reasonable factfinder to conclude, by a preponderance of the evidence, that their

speech, at least in part, motivated Defendants to transfer them.

      Defendants contend that Defendant Wartgow decided to transfer Plaintiffs as well as

some of the administrative staff on advice and recommendation of counsel. (Defs.' Br. at 42.)

Defendants assert that Defendant Wartgow's decision was not based on any electronic mail

messages Plaintiffs may have sent him or any of Plaintiffs' speech at meetings. (*Id.*) Not

surprisingly, Defendants do not offer any citation to the record in support of their argument.

(*Id.*)     Defendant Wartgow received a report from his attorney on July 14, 2003. (Pls.' Resp.,

Ex. 91 [7/14/03 Letter From Mooney Re: Potential North High School Staff Transfers].)

Plaintiffs contend that Defendant Wartgow made the decision to transfer Plaintiffs prior to

receiving his attorney's recommendations. (*Id.* at 102.) On May 14, 2003, Defendant Hobbs

sent an electronic mail message to Defendant Wartgow and Pettigrew. (Pls.' Resp., Ex. 85 [Email

From Def. Hobbs to Def. Wartgow Re: Request for Assistance].) Defendant Hobbs stated "I'm

requesting that the following staff are reassigned from [NHS] to other schools in the District so

that the healing process can began [sic]." (*Id.*) Amongst others, Defendant Hobbs listed

Plaintiffs Sedillos, Rhodes, Werner, and Shepard.  (*Id.*)  When Marsha Gonzales asked Defendant

Wartgow how he would make his decision regarding transfer, Gonzales alleged Defendant

Wartgow replied "by the number of [electronic mail messages] [I] received from disgruntled

employees." (Pls.' Resp., Ex. 26 ¶ 8 [Aff. of Marsha Gonzales].)  Robin Kane, Director of

Human Resources had a list of all five Plaintiffs by July 1, 2003 and Kane testified that she "had

logical placements for these teachers" by July 1, 2003. (Pls.' Resp., Ex. 39 at 149 [Dep. of

Kane].)  There are genuine issues of fact regarding when Defendant Wartgow made his decision to

transfer Plaintiffs, and whether Defendant Wartgow relied on Plaintiffs' statements and alleged

conduct in making his decision to transfer.  Accordingly, viewing the facts in a light most

favorable to Plaintiffs, Defendants are not entitled to summary judgment with respect this

portion of the First Amendment analysis.

### (D)     *Defendants Would Not Have Transferred Plaintiffs But For Their Speech*

If the employee shows that the speech was a substantial or motivating factor, the burden

shifts to the employer to show that it would have taken the same action in the absence of the

protected speech.  *Lytle v. City of Haysville, Kansas*, 138 F.3d 857, 863 (10th Cir. 1998).  Thus,

Defendants bear the burden to show that they would have taken the same action in the absence of

protected speech.  *Id.*

Defendants argue that:

> it is not what any of the Plaintiffs actually said, but what they reportedly did and
> how they reportedly did it, that resulted in their transfer.  NHS was a failing
> school and the constant and continuous haranguing of [p]rincipal brought in for
> change was not conducive to bringing about a healthy working environment . . .

(Defs.' Br. at 42–43.)  Defendants' argument as to this point is nonsensical.  Defendants

essentially admit that they transferred Plaintiffs because of Plaintiffs' conduct which, for all

intents and purposes, is Plaintiffs' speech.  Based on the evidence, I am not persuaded by

Defendants' semantical distinction between what Plaintiffs allegedly "said" as opposed to what

Plaintiffs allegedly "did."  Plaintiffs' conduct that Defendants rely on is essentially Plaintiffs'

complaints and conduct at meetings.  Thus, there is no difference between what Plaintiffs "did"

and what they "said."  In fact, Defendants' reference to Plaintiffs' "constant and haranguing of

[the] principal," acknowledges that Defendants are referring to Plaintiffs' speech.  (Defs.' Br. at

43.)  Moreover, Defendants have not offered any evidence regarding Plaintiffs' conduct that

justified transfer.  Again, conclusory statements, without more, are not sufficient to prevail on

summary judgment.  *Hicks*, 942 F.2d at 743; *Woodward*, 977 F.2d at 1398.  Thus, the facts

viewed in a light most favorable to Plaintiffs show a violation of the Plaintiffs' First Amendment

right to free speech.  Accordingly, Defendants are not entitled to summary judgment on

Plaintiffs' claim for retaliation in violation of section 1983 based on Plaintiffs' First Amendment

right to freedom of speech.[2]

_____

[2]This section ends the analysis with respect to Defendant Board of Education's motion
for summary judgment with respect to Plaintiffs' section 1983 claim based on the First
Amendment right to freedom of speech.  This does not end the analysis with respect to
Defendants Wartgow and Hobbs because those Defendants assert that they are entitled to

### (2)     *Freedom of Association*

The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances.  *NAACP v. Button*, 371 U.S. 415, 444–45 (1963).  Further, the First Amendment protects the right of associations to engage in advocacy on behalf of their members.  *Id.*  The government is prohibited from infringing upon these guarantees either by a general prohibition against certain forms of advocacy, or by imposing sanctions for the expression of particular views it opposes.  *See Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969).  "The right to associate protects an individual's decision to 'enter into and maintain certain intimate human relationships.'"  *Copp v. Unified Sch. Dist.*, 882 F.2d 1547, 1551 (10th Cir. 1989) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 [1984] [explaining that the First Amendment freedom of association protects relationships such as family, religion, petition of redress of grievances].)  The Supreme Court has recognized two types of association protected by the First Amendment.

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.  In this respect, freedom of association receives protection as a fundamental element of personal liberty.  In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment- speech, assembly, petition for the redress of grievances, and the exercise of religion.

---

qualified immunity on Plaintiffs' section 1983 claim. (Defs.' Br. at 43.)  As explained above, this section completes the first part of the qualified immunity analysis. *Analysis*, § 2, *supra*.  I discuss the second part — whether the law was clearly established — below.

*Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984).

Here, Plaintiffs' circumstances do not fit into either of these two categories. *See e.g.* *Copp*, 882 F.2d 1547 (plaintiff's allegation that he was transferred because of his general association with principal did not have a freedom of association claim because that is not the type of association the First Amendment shelters from governmental action). There are no allegations that Plaintiffs' rights of "intimate association" were impaired by Defendants. Additionally, Plaintiffs' rights of union or political association, in this case, are indistinguishable from their rights to free speech. The association that Plaintiffs seek is neither more nor less than an audience for their speech. The association claim, therefore, must collapse into the foregoing discussion regarding Plaintiffs' right to free speech. *See Schalk*, 906 F.2d at 497–98 (public hospital employee's comments to hospital board members could not form the basis of a freedom of association claim because she did not fall under either category outlined by the Supreme Court and her freedom of association or right to petition for redress of grievances was indistinguishable from her right to free speech). Further, the right to associate does not protect emotional bonds between public employees. *Grossart v. Dinaso*, 758 F.2d 1221, 1232 n. 16 (7th Cir. 1985). Accordingly, Defendants are entitled to summary judgment on Plaintiffs' First Amendment freedom of association claims.

   **b.      *Clearly Established Right***

As described above, Defendants' violated Plaintiff's constitutional right to free speech.

*See Analysis*, § 2(a)(1), *supra*.  Next, I turn to the question of whether this law was clearly

established when Defendants' transferred Plaintiffs.  If the law was not clearly established, then

Defendants Wartgow and Hobbs are entitled to qualified immunity.

Clearly established right for purposes of the qualified immunity defense means that:

> [t]he contours of the right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates that right.  This is not to say that
> an official action is protected by qualified immunity unless the very action in
> question has previously been held unlawful, but it is to say that in light of pre-
> existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The right allegedly violated must be defined at

the appropriate level of specificity before a court can determine if it was clearly established.

*Wilson v. Layne*, 526 U.S. 603, 615 (1999).  In determining whether a law was clearly

established, a court must rely on the objective reasonableness of an official's conduct as measured

by reference to the currently applicable law.  *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982).  If

the law at that time was clearly established, "the immunity defense ordinarily should fail, since a

reasonably competent public official should know the law governing his conduct."  *Id.*

The Tenth Circuit recognizes that "a rule of law determined by a balancing of interests is

inevitably difficult to clearly anticipate."  *Melton*, 879 F.2d at 729.  Nevertheless, the Tenth

Circuit has also noted that "to the extent that courts in analogous (but not necessarily factually

identical) cases have struck the necessary balance, government officials will be deemed on notice"

*Id.* n. 36; *see also Prager v. LaFaver*, 180 F.3d 1185, 1191–92 (10th Cir. 1999).  The United States Supreme Court and the Tenth Circuit have determined on countless occasions that a public employer cannot retaliate against an employee for exercising his or her constitutionally protected right of free speech.  *Rutan v. Republican Party*, 497 U.S. 62, 73 (1990) (employer's denial of a transfer based on employee's protected belief violates the First Amendment); *Givhan*, 439 U.S. at 414–16 (teacher's complaints and criticism of school policies and practices communicated privately to principal held protected by First Amendment); *McFall v. Bednar*, 407 F.3d 1081, 1090 (10th Cir. 2005) (government employee could not be terminated for speaking out on matters of public concern); *Lee v. Nicholl*, 197 F.3d 1291, 1296 (10th Cir. 1999) (public employees' speech alleging a danger to public health or safety is protected by the First Amendment); *Prager*, 180 F.3d at 1191–92 (employee's strong interest in disclosing wrongdoing on behalf of a public employer outweighs unsubstantiated assertions of workplace disruption); *Johnsen*, 891 F.2d at 1490 (public school nurse's speech critical of the school district's medication policy was a matter of public concern); *Conaway v. Smith*, 853 F.2d 789, 795 (10th Cir. 1988) (employee memo notifying the county that other employees were not discharging their governmental responsibilities is a matter of public concern).  These decisions are enough to put Defendants on notice that the conduct alleged in Plaintiffs' complaint would violate the law.  Accordingly, the law was clearly established in Plaintiffs' favor at the time Defendants transferred Plaintiffs and Defendants Hobbs and Wartgow are not entitled to qualified immunity.

Defendants assert that Defendant Wartgow is entitled to qualified immunity because he relied upon advice of counsel. (Defs.' Br. at 48.)  Specifically, Defendants assert that "[e]ven where a public official takes action that is unconstitutional in the light of clearly established law, but takes that action based upon advice of counsel, the public official should still be entitled to qualified immunity." (*Id.*)  Defendants allege that Defendant Wartgow made the decision to transfer Plaintiffs after he received Mooney's letter on July 14, 2003.  (*Id.*)  As stated above, (*analysis*, § 2(a)(1)(C), *supra*), there are genuine issues of fact regarding when Defendant Wartgow made his decision to transfer Plaintiffs, and whether Defendant Wartgow relied upon Mooney's July 14, 2003 report.  Thus, viewing the facts in a light most favorable to Plaintiffs, Defendants are not entitled to summary judgment on this issue.

**3.      *Plaintiffs' Breach of Contract*[3]**

Plaintiffs Sedillos, Rhodes, Werner, and Shepard allege that Defendants breached the contract between them when, "among other acts, they recommended and/or participated in the untimely, bad faith, retaliatory involuntary transfer of Sedillos, Rhodes, Shepard, and Werner." (Am. Compl. ¶¶ 124–29.)

Plaintiffs' employment in the District is governed by a Collective Bargaining Agreement ("the contract").  (Pls.' Resp., Ex. 73 [Collective Bargaining Agreement].)  Article thirteen of the

---

[3]Defendants do not include Plaintiff Walters' breach of contract claim in their motion for summary judgment. (Defs.' Br. 50–56.)  Accordingly, I do not address Plaintiff Walters' breach of contract claim.

contract is entitled "Assignments, Schedules and Transfers." (*Id.*, Ex. 73 at 37 [Collective

Bargaining Agreement].)  The first provision of article thirteen, 13–1 states:

> Teacher assignments, schedules and transfers will be made in the best interest of
> the educational program for the students and consistent with teacher preparation,
> certification and experience.  Every effort will be made to identify the District
> educational strategies, programs and leadership in a timely manner to maximize
> site-based planning, teacher selection, assignments and transfers.

(*Id.*) Section 13–7 states in relevant part that:

> A teacher may be transferred by the Superintendent from one school position, or
> grade level to another within the District, if such transfer does not result in the
> assignment of the teacher to a position of employment for which he/she is not
> qualified by virtue of academic preparation and certification.  There shall be no
> discrimination shown toward any teacher in the assignment or transfer of that
> teacher to a school, position or grade because of sex, race, creed, color, or
> membership in any group or organization.

(*Id.*, Ex. 73 at 42 [Collective Bargaining Agreement].)  Finally, section 13–7–1 describes

principal-recommended transfers.  (*Id.*)  Plaintiffs contend that the contract does not allow the

superintendent to transfer teachers unilaterally.  (*Id.* at 121.)  Defendants, on the other hand,

assert that Colo. Rev. Stat. § 22–63–206, grants statutory authority to the superintendent to

transfer teachers and the contract cannot conflict with the statute.  (Defs.' Br. at 51–52.)

Defendants contend that "[t]he transfers in question were 13–7 administrative transfers; there

[sic] were not Principal recommended transfers as outlined in Article 13–7–1." (*Id.* at 52.)  I do

not need to determine whether the transfers were made pursuant to sections 13–7, 13–7–1, or

Colo. Rev. Stat. § 22–63–206 because the parties agree that, at minimum, the transfers are governed by section 13–1. (Defs.' Br. at 51; Pls.' Resp. at 126.)

As stated above, section 13–1 requires that transfers " be made in the best interest of the educational program for the students and consistent with teacher preparation, certification and experience." (Defs.' Br., Ex. 73 at 37 [Collective Bargaining Agreement].)  There are genuine issues of material fact regarding whether these transfers were made in the best interest of the education program and were made consistent with teacher preparation, certification, and experience.  Plaintiffs produced evidence, in the form of affidavits, of other teachers and staff at NHS who opined that the transfer of Plaintiffs was detrimental to the educational process and not in the best interests of the education program at NHS or the District.  (Pls.' Resp., Ex. 5 ¶ 5 [Aff. of Victor Verdeal]; Ex. 6 ¶¶ 4–5 [Aff. of Victor Verdeal]; Ex. 14 ¶¶ 3, 5–6 [Aff. of Louise West]; Ex. 20 ¶¶ 3, 4, 6 [Aff. of Louise West]; Ex. 24 ¶¶ 4–6 [Aff. of Barbara De Haven Bennett].)  Defendants have not produced any evidence to the contrary.  Accordingly, Defendants are not entitled to summary judgment on Plaintiff Sedillos', Rhodes', Werner's, and Shepard's breach of contract claims.

## 4.    *Defendant Board of Educations' Rule 72 Objection*

On April 27, 2004, Defendant Board of Education filed an objection to the magistrate judge's order denying its motion for limited waiver of the attorney-client privilege. (Defs.' Objection to Magistrate's Order.)  The standard of review that this court employs in considering

a magistrate judge's recommendation depends upon whether the motion upon which the

magistrate judge has made a recommendation is dispositive or non-dispositive.  Under Federal

Rule of Civil Procedure 72(a), a district court may reverse a magistrate judge's decision on a non-

dispositive matter only if the decision is found to be "clearly erroneous or contrary to law."  Fed.

R. Civ. P. 72(a) (2004).  Under the clearly erroneous standard of review, the magistrate judge's

findings should not be rejected merely because the court would have decided the matter

differently.  *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985).  Rather, the district court

must affirm the decision of the magistrate judge unless "on the entire evidence[, the district court]

is left with the definite and firm conviction that a mistake has been committed."  *Id.* at 1464

(quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 [1948]).

The parties agree that the motion to permit limited waiver of attorney-client privilege is a

non-dispositive motion and the standard of review is clearly erroneous.  (Defs.' Objection to

Magistrate's Order at 3; Pls.' Resp. to Defs.' Objection at 3.)  Accordingly, I review the

magistrate judge's decision regarding Defendant Board of Education's motion under the clearly

erroneous standard.

Defendant Board of Education's motion to permit limited waiver requested that a waiver

would cover "all of [Defendant] Wartgow's discussions with Mr. Mooney concerning

[Defendant] Wartgow's request for Mr. Mooney's advice concerning the situation at [NHS], Mr.

Mooney's recommendations concerning the transfer of teachers and [Defendant] Wartgow's

decision to transfer four of the Plaintiffs." (Def. Board of Educ. Mot. to Permit Limited Waiver

at 5.) The magistrate judge denied Defendant Board of Education's motion, but somewhat

inconsistently, recognized a limited waiver.

The magistrate judge correctly pointed out that "the attorney-client privilege cannot be

used as a sword and a shield." (Magistrate's Order at 3.) Further the magistrate judge's order

provided that:

> [Defendant] Wartgow cannot on the one hand claim as a defense that he relied on
> the advice of counsel, Mr. Mooney, waiving the attorney-client privilege to
> support that defense . . . while at the same time invoking the attorney-client
> privilege to prevent the [P]laintiffs from exploring fully the substance and
> circumstances of that advice.

(*Id.* at 4 [internal citations ommitted].) The magistrate judge's order recognizes a limited waiver

with respect to the subject matter of the advice. (*Id.* at 5.) Specifically, the magistrate judge

noted that "[Defendant] Wartgow's decision to place the advice of counsel in issue in this case is

an affirmative act which has resulted in a waiver of the attorney-client privilege with respect to

the subject matter of the advice." (*Id.*) Indeed, the parties agree that a limited waiver is

appropriate, however, they quibble over the scope of such waiver. (Defs.' Objection to

Magistrate's Order ¶¶ 5, 7, 8; Pls.' Resp. to Defs.' Objection ¶ 8.)

While the purpose of the attorney-client privilege is to encourage clients to communicate

freely with their attorneys, the privilege is narrowly construed because it reduces the amount of

information discoverable during the course of a lawsuit. *United States v. Collis*, 128 F.3d 313,

320 (6th Cir. 1997).  A client can waive the privilege by voluntarily disclosing his attorney's advice to a third party.  *Id.*  The scope of the waiver turns on the scope of the client's disclosure, and the inquiry is whether the client's disclosure involves the same "subject matter" as the desired testimony.  *Id.*; *see also Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408, 415 (D. Del. 1992).

In light of the foregoing, it is peculiar that the magistrate judge flatly denied Defendant Board of Education's motion for limited waiver while correctly acknowledging that limited waiver in this context was appropriate.  (Magistrate's Order at 5–6.)  It appears that the magistrate judge recognized the propriety of a limited waiver in this context, however, and determined that Defendant Board of Education's proposed scope of the waiver was too limited.  The court cannot say, on this record, that the decision is clearly erroneous.

### 5.   *Plaintiff Rhodes' Motion For Leave to Amend Her Complaint*

On April 21, 2005, Plaintiff Rhodes filed a "Motion For Leave to File Second Amended and Supplemental Complaint."  (Pl. Rhodes' Mot. for Leave to Am.)  Plaintiff Rhodes seeks to amend her complaint to add a Title IX retaliation claim against Defendant Board of Education. (*Id.* at 2.)  The Scheduling Order entered on October 9, 2003, established March 8, 2004 as the discovery cut-off date.  (Scheduling Order [filed Oct. 9, 2003].)  On April 7, 2004, the magistrate judge granted Plaintiffs' motion to supplement the amended complaint and he extended discovery through May 24, 2004.  (Magistrate's Order 4/7/04 [filed Apr. 7, 2004].)  Defendants filed their

motion for summary judgment on April 9, 2004. (Defs.' Br.)  By September 17, 2004, the

parties completed briefing on the motion for summary judgment.  (Pls.' Surreply.)

Where, as here, a motion to amend the pleadings and join an additional claim is filed after

the scheduling order deadline, a "two-step analysis" is required.  *Dilmar Oil, Co., Inc. v.*

*Federated Mut. Ins. Co.*, 986 F. Supp. 959, 980 (D. S.C. 1997).  Once a scheduling order's

deadline for amendment of pleadings has passed, a movant must first demonstrate to the court

that it has a "good cause" for seeking modification of the scheduling deadline under Rule 16(b).

*Id.*  If the movant satisfies Rule 16(b)'s "good cause" standard, it must then pass the

requirements for amendment under Rule 15(a).  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d

604, 608 (9th Cir. 1992); *Smith v. United Parcel Service, Inc.*, 902 F. Supp. 719, 720 (S.D.W.V.

1995); *Marcum v. Zimmer*, 163 F.R.D. 250–254 (S.D.W.V. 1995); *Forstmann v. Culp*, 114

F.R.D. 83, 85–86 (M.D.N.C. 1987);

Rule 16 was drafted to prevent parties from disregarding the agreed-upon course of

litigation.  *Dilmar Oil*, 986 F. Supp. at 980.  This Rule assures the court and the parties that "at

some point both the parties and the pleadings will be fixed."  Fed. R. Civ. P. 16(a) advisory

committee's note, 1983 amendment.  "A scheduling order is not a frivolous piece of paper, idly

entered, which can be cavalierly disregarded by counsel without peril."  *Dilmar Oil*, 986 F. Supp.

at 980 (citing *Jordan v. E.I. du Pont de Nemours*, 867 F.Supp. 1238, 1250 [D.S.C. 1994] [citing

*Johnson,* 975 F.2d at 610]).  Rule 16(b), unlike Rule 15, does not focus on the bad faith of the

party moving to amend his pleading or on prejudice to the opposing party. *Dilmar Oil*, 986 F. Supp. at 980. Instead, the standard is the diligence demonstrated by the moving party in attempting to meet the court's deadlines. *Colorado Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 687 (D. Colo. 2000). "Good cause" under Rule 16(a) means that scheduling deadlines cannot be met despite a party's diligent efforts. 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Procedure § 1522.1 at 231 (2d ed. 1990). In other words, this court may "modify the schedule on a showing of good cause if [the deadline] cannot be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16(a) advisory committee's note, 1983 amendment; *Forstmann*, 114 F.R.D. at 85. "Rule 16(b) erects a more stringent standard, requiring some persuasive reason as to why the amendment could not have been effected within the time frame established by the court." *Colorado Visionary*, 194 F.R.D. at 687.

Plaintiff Rhodes contends that (1) in light of the recent United States Supreme Court's ruling in *Jackson v. Birmingham Board of Educ.*, 125 S. Ct. 1497 (2005), she has a valid claim, and (2) she did not know of her claim prior to the *Jackson* ruling. (Pl. Rhodes' Mot. for Leave to Am. ¶¶ 3–4.) In *Jackson*, the Supreme Court held that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Id.* at 1504. Plaintiff Rhodes asserts that she:

> reported to Human Resources and to upper-level administration in the [District]
> that female students who had made allegations of misconduct against Williams had
> been called in to Defendant Hobbs' office and were improperly interrogated by
> him without their parents' knowledge and, in at least one case, was accused of
> dishonesty and inconsistency.

(Pl. Rhodes' Mot. for Leave to Am. ¶ 2.)  Plaintiff Rhodes contends that Defendants transferred

her to a different school in part because of her complaints concerning Williams' conduct and

Defendant Hobbs' handling of the situation.  (*Id.*)  Plaintiff Rhodes has not established good

cause to modify the scheduling order.  The actual language of *Jackson* indicates that Plaintiff

Rhodes' potential Title IX claim existed prior to the *Jackson* ruling.  Specifically, the Court in

Jackson held that:

> our cases since *Cannon* [*v. Univ. of Chicago*, 441 U.S. 677 (1979)], such as
> *Gebser* [*v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998)] and *Davis* [*Next
> Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999)], have
> consistently interpreted Title IX's private cause of action broadly to encompass
> diverse forms of intentional sex discrimination.  Indeed, retaliation presents an
> even easier case than deliberate indifference.

*Jackson*, 125 S. Ct. at 1509.  Thus, the very language of *Jackson* indicates that Plaintiff could

have included her Title IX claim in an earlier pleading.  Plaintiff Rhodes has not established good

cause to amend her complaint eleven months after the close of discovery and over seven months

after the parties completed extensive briefing on the motion for summary judgment.  Accordingly,

Plaintiff Rhodes' motion to amend her complaint must be denied.

**6.     *Plaintiffs' Motion to Reopen Discovery For a Limited Purpose***

Plaintiffs seek to reopen discovery so they can propound discovery requests to Defendants to obtain documents and information relating to Defendant Hobbs' conduct as principal at Emily Griffith High School. (Pls.' Mot. to Reopen Disc. ¶ 4.) In addition, Plaintiffs wish to depose two new potential witnesses and re-depose Defendants Wartgow and Hobbs. (*Id.*) Plaintiffs assert that they have information that "faculty members and other employees of Emily Griffith High School submitted complaints about Defendant Hobbs' conduct during the time that he was principal of that school" that is relevant to their claims in the instant case. (*Id.* ¶¶ 1–2.) Not surprisingly, Defendants "vehemently" oppose this motion. (Defs.' Resp. to Pls.' Mot. to Reopen Disc. ¶ 3.)

Whether to extend or reopen discovery is committed to the sound discretion of the trial court. *Smith v. United States*, 834 F.2d 166, 169 (10th Cir. 1987). The Tenth Circuit has promulgated numerous factors to consider when determining whether discovery should be reopened after the Rule 16 Scheduling Order, including: (1) whether trial is imminent, (2) whether the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood that the discovery will lead to relevant evidence. *Id.*

Here, the request is "vehemently" opposed. (Defs.' Resp. to Pls.' Mot. to Reopen Disc. ¶ 3.) Additionally, Defendants would be prejudiced if Plaintiffs were entitled to reopen discovery. Plaintiffs took over thirteen depositions in this case and propounded three sets of written discovery. Plaintiffs thoroughly deposed Defendants Hobbs and Wartgow. Further, Plaintiffs have not demonstrated that additional discovery will lead to relevant evidence. As stated above, Plaintiffs wish to reopen discovery to obtain "evidence concerning Defendant Hobbs' actions at Emily Griffith High School, the complaints about his conduct and Defendants Board of Education's and Wartgow's personnel decisions concerning him. . . ." (Pls.' Mot. to Reopen Disc. ¶ 3.) Defendant Wartgow transferred Defendant Hobbs from NHS to Emily Griffith High School. (*Id.* ¶ 1.) Defendant Hobbs' alleged conduct at Emily Griffith High School occurred after Plaintiffs' transfer from NHS. Thus, this conduct has no bearing on Plaintiffs' section 1983 claim or Plaintiffs' breach of contract claims. *See Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1217 (10th Cir. 1998) (holing that testimony of other employees may be relevant in assessing a retaliation claim, however, for such testimony to be relevant, plaintiff must show the circumstances can "logically or reasonably be tied to the decision to terminate the plaintiff." [quoting *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990)]); *see also Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000) ("Discriminatory incidents which occurred either several years before the contested action or anytime after are 'not sufficiently connected to the employment action in question . . .'" [quoting

*Simms v. State of Oklahoma*, 165 F.3d 1321, 1330 (10th Cir. 2000)]). Thus, the information

Plaintiffs seek to obtain through further discovery will not lead to relevant evidence in this case.

Accordingly, Plaintiffs are not entitled to reopen discovery at this late stage in the litigation.

**7.      Conclusions**

Based on the foregoing it is therefore

ORDERED as follows:

1.      Defendants' motion for summary judgment (# 77) is GRANTED in part and

DENIED in part. Defendants' motion is GRANTED with respect to Plaintiffs' section 1983

claim based on the First Amendment freedom of association. Defendants' motion is DENIED

with respect to Plaintiffs' section 1983 claim based on the First Amendment freedom of speech

claim and Plaintiff Sedillos', Rhodes', Werner's, and Shepard's breach of contract claim.

2.      Plaintiffs' motion for leave to file a second amended complaint (# 116) is DENIED.

3.      Plaintiffs' motion to reopen discovery (# 115) is DENIED.

4.      The objections to the magistrate judge's ruling on attorney-client privilege (# 83)

are OVERRULED. The magistrate judge's order will stand as the order of the court.

5.      The court will hold a Final Pretrial Conference commencing at 4:30 o'clock p.m.

on Friday, October 28, 2005, in Courtroom A1001 of the Alfred A. Arraj United States

Courthouse, 901 19th Street, Denver, Colorado. In preparing for and participating in the

conference, the parties and counsel will (1) follow the Instructions for Preparation and

Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template located at http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord.wpd  These specific web addresses should be used to insure that the proper format is observed.

Dated this 29th day of August, 2005.


BY THE COURT:


s/Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge